[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 01-17176

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 9, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 98-00721-CR-JAL

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RUBEN CAMPA,
a.k.a. John Doe 3,
a.k.a. Vicky,
a.k.a. Camilo,
a.k.a. Oscar,
RENE GONZALEZ,
a.k.a. Iselin,
a.k.a. Castor,
GERARDO HERNANDEZ,
a.k.a. Giro,
a.k.a. Manuel Viramontez,
a.k.a. John Doe 1,
a.k.a. Manuel Viramontes,
LUIS MEDINA,
a.k.a. Oso,
a.k.a. Johnny,
a.k.a. Allan,
a.k.a. John Doe 2,
ANTONIO GUERRERO,
a.k.a. Rolando Gonzalez-Diaz,
a.k.a. Lorient,

Defendants-Appellants.

No. 03-11087
_____

D. C. Docket No. 00721-CR-JAL

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GERARDO HERNANDEZ,
a.k.a. Giro, a.k.a. Manuel Viramontez,
a.k.a. John Doe 1, a.k.a. Manuel Viramontes,
LUIS MEDINA,
a.k.a. Oso, a.k.a. Johnny, a.k.a. Allan,
a.k.a. John Doe 2,
RENE GONZALEZ,
a.k.a. Iselin, a.k.a. Castor,
ANTONIO GUERRERO,
a.k.a. Rolando Gonzalez-Diaz, a.k.a. Lorient,
RUBEN CAMPA,
a.k.a. John Doe 3, a.k.a. Vicky, a.k.a. Camilo, a.k.a. Oscar,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(August 9, 2006)**

Before EDMONDSON, Chief Judge, and TJOFLAT, BIRCH, DUBINA, BLACK,
CARNES, BARKETT, HULL, MARCUS, WILSON, PRYOR and KRAVITCH*,
Circuit Judges.

_____
        * Senior Circuit Judge Kravitch elected to participate in this decision pursuant to 28
U.S.C. § 46(c).

2

WILSON, Circuit Judge:

This case involves the Miami trial and conviction of five defendants for acting and conspiring to act as unregistered Cuban intelligence agents working within the United States and for conspiring to commit murder. The defendants, Ruben Campa, Rene Gonzalez, Gerardo Hernandez, Luis Medina, and Antonio Guerrero, appealed their convictions and sentences, arguing that the pervasive community prejudice against the Cuban government and its agents and the publicity surrounding the trial that existed in Miami prevented them from obtaining a fair and impartial trial. We reviewed this case en banc to determine whether the district court abused its discretion when it denied their multiple motions for change of venue and for new trial. We now affirm.[1]

## I. BACKGROUND

### A.    The Indictments

On September 12, 1998, the five defendants were arrested, and were

---

[1] The defendants raised the following additional issues on appeal: prosecutorial misconduct regarding the testimony of a government witness and during closing argument; improper use of the Classified Information Procedures Act; improper denial of a motion to suppress fruits of searches under the Foreign Intelligence Surveillance Act; *Batson* violations; insufficiency of the evidence regarding the conspiracy to transmit national defense information to Cuba, violations of the Foreign Services Registration Act, and conspiracy to commit murder; improper denial of a motion to dismiss Count 3 based on Foreign Sovereign Immunities Act jurisdictional grounds; improper denial of jury instructions regarding specific intent, necessity, and justification; and sentencing errors. We remand this case to the panel for consideration of these outstanding issues.

3

subsequently indicted on October 2, 1998, for acting and conspiring to act as

agents of the Republic of Cuba without prior notification to the Attorney General

of the United States in violation of 18 U.S.C. §§ 951(a) and 2 and 28 C.F.R. § 73.1

et seq., and of defrauding the United States concerning its governmental functions,

in violation of 18 U.S.C. § 371.[2]  The indictment alleged:

> [The defendants] function[ed] as covert spies serving the interests of
> the government of the Republic of Cuba within the United States by
> gathering and transmitting information to the Cuban government
> concerning United States military installations, government functions
> and private political activity; by infiltrating, informing on and
> manipulating anti-Castro Cuban political groups in Miami-Dade
> County; by sowing disinformation within these political groups and in
> dealings with United States private and public institutions; and by
> carrying out other operational directives of the Cuban government.[3]

Hernandez, Medina, and Guerrero were also charged with conspiring to deliver to

Cuba "information relating to the national defense of the United States, . . .

intending and having reason to believe that the [information] would be used to the

injury of the United States and to the advantage of [Cuba]," in violation of 18

U.S.C. §§ 794(a), (c), and 2.[4]  Hernandez was also indicted for conspiracy to

---

[2]R1-224.  The government filed a second superceding indictment on May 7, 1999.  *Id.*

[3]*Id.* at 3-4.

[4]*Id.* at 11-13.

perpetrate murder in the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. §§ 1111 and 2, in connection with the Cuban military's shootdown of two United States-registered civilian aircraft on February 24, 1996, in violation of 18 U.S.C. §§ 1117 and 2.[5] Hernandez, Medina, and Campa were indicted for possession of a counterfeit United States passport, in violation of 18 U.S.C. §§ 1546(a) and 2, and possession of fraudulent identification documents in violation of 18 U.S.C. §§ 1028(a)(3), (b)(2)(B), (c)(3), and 2.[6] Medina was indicted for making a false statement to obtain a United States passport, in violation of 18 U.S.C. §§ 1542 and 2.[7] Hernandez, Medina, and Campa were indicted for causing individuals they oversaw to act as unregistered foreign agents without prior notification to the Attorney General, in violation of 18 U.S.C. §§ 951 and 2 and 28 C.F.R. § 73.1 et seq.[8] Their trial was set to proceed in the Southern District of Florida in Miami.

Shortly after the indictments were returned and upon the government's motion, on October 20, 1998, the court entered a gag order ordering all parties and

---

[5]*Id.* at 13-16.

[6]*Id.* at 16-22.

[7]*Id.* at 20.

[8]*Id.* at 23-31.

their attorneys to abide by Southern District of Florida Local Rule 77.2.[9]  The parties and their attorneys were ordered to "refrain from releasing 'information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation' where ' such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.'"[10]

### B.    Pretrial Change of Venue Motions

On August 16, 1999, Medina filed a motion for authorization of funds to conduct a survey of the Miami-Dade County community, as a predicate for a motion for change of venue.[11]  Medina requested authorization to engage Florida International University Psychology Professor Gary Patrick Moran for $9,500 to conduct a poll of a representative sample of the population of Miami-Dade County to determine whether it was a fair venue for the trial.[12]  Moran proposed a "standard" telephone poll of 300 people.[13]  The district court granted Medina's

---

[9] 2SR1-122 at 1.

[10] *Id.* at 1-2 (quoting S.D. Fla. L.R. 77.2(A)(1)).

[11] R1-275.

[12] R1-280 at 3.

[13] *Id.*

motion.[14]

In January of 2000, Campa, Gonzalez, Guerrero, and Medina each moved for a change of venue out of the Southern District of Florida.[15] They argued that they would be denied due process and a fair trial with an impartial jury as a result of the pervasive community prejudice in Miami against anyone associated with the Cuban government.[16] In support of their motions, they submitted the results of Professor Moran's survey and numerous news articles.[17]

Moran's survey consisted of 11 opinion and 21 demographic questions designed "to examine prejudice against anyone alleged to have assisted the Castro Cuban government in espionage activities."[18] Focus On Miami, a data collection company located in Miami-Dade County, was retained to conduct the survey by telephone.[19] In Section 1 of the survey, the interviewer made a series of 11 statements and questions regarding the defendants' alleged illegal conduct and

---

[14]R2-303.

[15]R2-317, 321, 324, 329, 334; R3-397, 455.

[16]*See id.* Later, at oral argument on the motions, they agreed that they would be satisfied with a transfer of the case within the Southern District of Florida from the Miami Division to the Fort Lauderdale Division. R5-586 at 2, n.1.

[17]*See id.*

[18]R2-321, Ex.A at 16.

[19]*Id.* at Ex.C at 1.

general statements about Cuba and Castro to which the respondent was instructed to answer either "agree strongly," "agree," "disagree," "disagree strongly," or "don't know."[20]   In Section 2 of the survey, the interviewer asked a series of 21 demographic questions designed to gather information about the respondent's background, lifestyle, media exposure, and involvement in pro- or anti-Cuba

---

[20]*Id.* at Ex.D at 1-3.  The interviewer began each survey by stating, "We are conducting a survey of south Florida voters to see how they feel about the upcoming trial of some people charged in federal court with spying for Castro's Cuba.  Your house has been randomly selected to provide a participant for this survey." *Id.* at 1.  The interviewer then asked whether the interviewee was "aware of the case involving the alleged Cuban spies who were arrested in Miami?" *Id.*  The interview then proceeded with Section 1 of the survey, which included the following statements and questions:

1.  Cuban born persons carrying false identification documents and engaging in intelligence gathering activities in south Florida are Castro spies.
2.  These defendants are charged with setting up the ambush of the Brothers to the Rescue planes in which four people were killed.  This type of activity is characteristic of the Castro regime.
3.  The aim of Castro is to undermine legitimate Cuban exile organizations.
4.  An aim of Castro is to infiltrate U.S. military bases in South Florida.
5.  Castro's agents have attempted to disrupt peaceful demonstrations such as the Movimiento Democracia's flotillas which honor fallen comrades.
6.  Castro's Cuba is an enemy of the United States.
7.  Castro poses a real threat to the lives of Cuban [sic] exiles.
8.  Castro's spies should not be given a public trial if this threatened national security.
9.  Because of my feelings and opinions about Castro's government I would find it difficult to be a fair and impartial juror in a trial of alleged Cuban spies.
10. You have told me that you would find it (difficult/not difficult) to be a fair and impartial juror.  Are there any circumstances that would change your opinion?  If so, what?
11. Suppose your jury found these spy defendants not guilty.  How worried would you be that you might be criticized in your community?

*Id.* at 2-3.

8

groups.[21]

According to Professor Moran, the results of the survey indicated that 69% (with a sampling error of 5.3%) of eligible jurors were prejudiced.[22] Around 40% of the respondents (60% of the Hispanic respondents) "indicate[d] that they would find it difficult to be impartial."[23] Around 90% "would not change their minds

---

[21] *Id.* at 3-5. Section 2 of the survey asked the following questions:

12. In what community do you live?
13. What is your zip code?
14. In what country were you born?
15. How long have you lived in South Florida?
16. Do you subscribe to, buy, or read a daily newspaper?
17. If you read a daily newspaper is it in English or Spanish?
18. Do you regularly listen to the news on the radio?
19. If you listen to the news on the radio is it in English or Spanish?
20. Do you regularly watch the news on the television?
21. If you watch the news on television is it in English or Spanish?
22. Do you have close friends or family members in Cuba now?
23. Are you an active member of any Pro-Cuba/Anti-Castro groups?
24. Do you donate money to Pro-Cuba/Anti-Castro groups or causes?
25. What is (was) your occupation?
26. What is your age today?
27. What is your marital status today? . . .
28. What is the highest level of education that you have COMPLETED? . . .
29. Aside from the political party with which you are registered, how would you describe your current political views or beliefs? . . .
30. Which [ethnicity] best describes your background? . . .
31. Which [monetary range] best describes your total household annual income . . . .
32. Respondent's sex.

*Id.*

[22]*Id.* at Ex.A at 16.

[23]*Id.*

under any circumstances."[24]  Finally, approximately one-third of the respondents

were "at least somewhat worried about community criticism in the event of a 'not

guilty' verdict."[25]  Based on these results, Professor Moran concluded the

following:

> I conclude . . . to a reasonable scientific certitude that a change of
> venue from the Miami Division of the Southern Federal District of
> Florida is the only viable means of assuring the defendant a fair and
> impartial jury.  The results of the survey suggest that a jury chosen
> from the District will hold firm opinions prejudicial to this defendant
> that cannot be put aside.  A reasonable likelihood of prejudice
> endangering the right to a fair trial exists.[26]

Moran further noted that two prior surveys from the early 1980's and from 1997,

which also evaluated the Southern District of Florida, reached similar

conclusions.[27]  According to Moran, this suggested that prejudicial opinions in the

Southern District of Florida were "fixed" and "[could not] be set aside."[28]

In addition to Moran's survey, the defendants also submitted numerous

newspaper articles on their case and other Cuba-related issues.[29]  They argued that

---

[24]*Id.*

[25]*Id.*

[26]*Id.*

[27]*Id.* at 8-11, 16.

[28]*Id.* at 11.

[29]R2-317, 321, 324, 329, 334; R3-397, 455.

these articles demonstrated that the community atmosphere is "so pervasively inflamed" that "resort to questioning in the cool reflection of a courtroom is not sufficient to cleanse the record."[30]

The government opposed the defendants' change of venue motion and maintained that an extensive voir dire of prospective jurors would ensure a fair and impartial jury.[31] It disputed that pervasive community prejudice existed and instead argued that the Miami-Dade population was "heterogenous" and "highly diverse."[32] It further noted that many of the news articles that the defendants submitted either did not relate to the instant case, or were accurate, objective, and unemotional.[33] The news coverage "pale[d] in comparison" with the biased coverage and sensationalism found in the rare cases in which previous courts had found presumed prejudice.[34]

The government further argued that Professor Moran's survey was unreliable due to numerous flaws in his procedures and conclusions.[35] In

---

[30]R2-317 at 3.

[31]R3-443 at 3.

[32]*Id.* at 11.

[33]*Id.* at 5, n.3.

[34]*Id.*

[35]*Id.* at 6-12.

11

particular, it disputed Professor Moran's reliance on the two surveys that were used in prior, unrelated cases, which concluded that a substantial prejudice existed in the Southern District of Florida against defendants alleged to have helped the Castro government.[36] The first was the survey put forth in support of an unsuccessful change of venue motion in *United States v. Fuentes-Coba*,[37] a case involving illegal shipments of goods in violation of the Trading with the Enemy Act. We affirmed the district court's refusal to change venue, after the court reviewed the survey, determined no pervasive community prejudice had been shown, and conducted a thorough voir dire, thus ensuring a fair and impartial jury.[38] The government argued here that the court should follow this course of action by proceeding to voir dire to explore any potential jury bias.[39] The second survey that Moran relied on was the one he designed for *United States v. Broder*,[40] another Trading with the Enemy Act case involving Cuba in which the district court denied the defendants' motion for change of venue. One of the *Broder* defendants proceeded to trial and was acquitted of all charges, disproving Moran's

[36]*Id.* at 6-9.

[37]738 F.2d 1191, 1194 (11th Cir. 1984).

[38]*Id.* at 1195.

[39]R3-443 at 7.

[40]No. 97-267 (S.D. Fla. 1997).

12

conclusion that the Miami-Dade jury pool was hopelessly prejudiced against defendants charged with associating with Castro's Cuba.[41] In other words, the government argued that the very surveys which Moran relied upon in the instant case discredited his theory and instead demonstrated that Miami-Dade jurors would base their verdict on evidence, not prejudices.[42]

The government argued that Moran's survey was not well-designed, did not measure prejudice accurately, and engaged in broad, unsupported characterizations of the South Florida community.[43] For example, the government noted the near-verbatim similarity between Moran's *Broder* survey and affidavit and his survey and affidavit in the present case, suggesting that Moran's conclusions revealed "the foreordained conclusions of a predisposed and partisan expert, who has not even bothered to change the wording of his purportedly scientific results."[44] Many

---

[41]R3-443 at 7.

[42]*Id.*

[43]*Id.* at 8-9.

[44]*Id.* at 8. The government noted the close similarity between the two surveys and the "echo-like nature" of Moran's affidavit by referencing the following example. *Id.* In Moran's 1997 *Broder* affidavit, Moran concluded:

Inability to be Fair and Impartial

Finally, note item 14:
"Because of my feelings and opinions about the U.S. trade embargo on Cuba, I would find it difficult to be a fair and impartial juror in a case

13

of the questions were ambiguous or were written in non-neutral terms, which

demonstrated Moran's failure to follow scientific procedures.[45]  To further support

its position, the government submitted the affidavit and curriculum vitae of

Professor J. Daniel McKnight[46] who opined that Professor Moran's *Broder* survey

"lack[ed] empirical rigor, scientific validity and provide[d] no estimation of its

scientific reliability."[47]  Although McKnight's analysis was of the *Broder* survey

and affidavit, McKnight's evaluation was germane to the instant case given the

---

> about an alleged violation of the Cuban embargo."
> Circa 59% of the respondents are unable to agree that they can be
> impartial.  This is very unusual!

*Id.* at Ex.A at 15.  By comparison, Moran's affidavit in the present case uses similar language
and structure:

> Inability to be Fair and Impartial
>
> Finally, note item 9:
> 'Because of my feelings and opinions about Castro's government, I would
> find it difficult to be a fair and impartial juror in a trial of alleged Cuban
> spies."
> Circa 39.6% (57.4% of the Hispanic subsample) of the respondents are
> unable to affirm that they would be impartial and fair.  This is very
> unusual!

R2-321, Ex.A at 12.

[45]R4-443 at 9-11.

[46]*Id.* at Ex.B at 1.  Professor McKnight is a social psychologist specializing in social
perception, research methodology, and psychometrics.  *Id.*

[47]*Id.* at Ex. B at 2.

14

striking similarities between two sets of surveys and affidavits.[48]

Following extensive oral argument, on June 27, 2000, the district court denied the defendants' motion without prejudice, finding that they had failed to present sufficient evidence "to raise a presumption of prejudice against [them] as would impair their right to a fair trial by an impartial jury in Miami-Dade County."[49] The court found that most of the news articles related to events other than the defendants' alleged activities, and that except for articles regarding the codefendants' sentences and one editorial noting the Brothers to the Rescue shootdown anniversary, the articles about the shootdown were more than one year old and were largely factual.[50] Accordingly, the court found that pretrial publicity was not sufficiently pervasive and inflammatory to raise a presumption of prejudice.[51]

---

[48]*Id.* at 9.

[49]R5-586 at 16.

[50]*Id.* at 11. Brothers to the Rescue is a Miami-based Cuban exile group founded in 1991 to rescue rafters fleeing Cuba in the Straits of Florida and to bring them to the United States. *See id.* at 2; R80 at 8836-37. On February 24, 1996, three Brothers to the Rescue planes flew into the Florida Straits, toward Cuba, in search of reported rafters. R83 at 9161-70. When the three planes reached international airspace between the United States and Cuba, Cuban military ground control authorized Cuban aircraft to fire on and destroy the Brothers to the Rescue planes. *Id.* at 9181-85; Govt. Ex. 483 at 8-16. The Cuban military aircraft shot down two of the planes, but one escaped. *Id.*

[51]R5-586 at 11.

The court also found Professor Moran's survey and affidavit insufficient to establish pervasive community prejudice for six reasons.[52] The court faulted the survey for: (1) including respondents who were completely unaware of this case in quantifying alleged community prejudice against the defendants; (2) failing to measure prejudice toward a particularized group of people, i.e., a "social target," making prejudice calculations "unreliable" and "without substantial support"; (3) failing to use neutral terminology, contrary to standard scientific procedure; (4) asking ambiguous questions; and (5) using an inadequate sample size, representing only 0.003% of eligible Miami-Dade jurors.[53] "[M]ost significantly," Professor Moran relied on the same study that we rejected in *Fuentes-Coba* to bolster his conclusion that community prejudice existed in Miami-Dade.[54] Under these circumstances, the court was unwilling to afford the survey and Professor Moran's conclusion the weight attributed by the defendants.[55] However, the court promised a thorough voir dire and invited the defendants to renew their motions if

---

[52]*Id.* at 13-15.

[53]*Id.*

[54]*Id.* at 15.

[55]*Id.* at 13-14.

16

voir dire showed "that a fair and impartial jury [could not] be empaneled."[56]

## C.    Voir Dire

The case proceeded to voir dire.   The court held two status conferences to develop the voir dire questions.[57]   Although the defendants stipulated to the government's proposed questions,[58] the parties argued at length regarding the terminology of the questions and made suggestions for revisions.[59]   The court deliberated extensively and carefully over the questions, keeping in mind the defendants' unsuccessful motions for change of venue: "I promised you all and

---

[56]*Id.* at 17.  On September 15, 2000, Campa moved for reconsideration of the denial of the motion for change of venue, arguing that the court failed to consider how the defendants' theory of defense affected their ability to receive a fair trial in Miami.  R5-656.  The court denied reconsideration without prejudice, stating that it had previously addressed the defendants' arguments.  R6-723 at 2.  The court explained that it could explore any potential bias during voir dire examination and carefully instruct the jurors during the trial.  *Id.*  The court again invited the defendants to renew their motion for change of venue, if it determined after voir dire that a fair and impartial jury could not be empaneled.  *Id.* at 2-3.

[57]1SR1; 1SR2.

[58]1SR1 at 42.

[59]1SR1; 1SR2.  One of the most heated debates was whether and how the court should question prospective jurors' support of pro- or anti-Castro political groups, and whether the court should specifically delineate nine of those groups, a question suggested by the defendants.  1SR2 at 63-74; 1SR1 at 48-55.  Over the government's objection that such a question improperly implied an association between the Brothers to the Rescue and other historically violent groups, the court decided to include the question. 1SR1 at 51-54.  Another debate centered around whether and how the court should question prospective jurors who formerly lived in Cuba regarding how they came to live in the United States.  1SR1 at 29-36.  The defendants suggested that the court ask whether they had an exit visa because those who left Cuba illegally would have a different outlook on the case than those who left the country legally.  1SR1 at 29-30, 35.  The government objected, arguing that such questions would make the prospective jurors feel extremely uncomfortable, but the court decided to ask the question anyway.  1SR1 at 32-33, 35.

17

[e]specially the defendants when I denied your motions for change of venue, that I would consider extensively your request for voir dire . . . ."[60] Ultimately, the court developed an exhaustive list of questions for a two-phase voir dire.[61] The court noted, "[m]ore questions are being asked of this jury as far as their background than questions that are ever asked or have been asked of jurors that certainly have appeared before me in cases; but I have agreed that this is a case that requires additional inquiry and certainly there is additional inquiry here . . . ."[62]

Phase one would consist of the general questioning of the voir dire, which was aimed at determining the jurors' qualifications to serve in the case.[63] During this phase, panels of approximately 34 prospective jurors would be in the courtroom at a time.[64] The court would ask the group a set of 16 general questions, and then each juror would read aloud to the court their answers to a 28-question written questionnaire.[65] It would ask additional, follow-up questions

---

[60] 1SR2 at 73-74.

[61] 1SR1 at 5.

[62] 1SR1 at 29.

[63] *Id.* at 5.

[64] *Id.* at 9.

[65] *Id.* at 5; R6-766.

when necessary.[66] The court rejected the parties' requests for attorney-conducted voir dire, and determined that it would ask all of the questions during both phases of the voir dire.[67] The court did, however, promise to inquire whether there were any additional questions that the parties wished the court to ask any individual juror, or the panel as a whole, after the completion of the general questions and the questionnaires.[68] The parties would then exercise challenges for cause and hardship for each panel.[69]

Once the court had questioned several venire panels of 34 prospective jurors, it would proceed to phase two with the remaining jurors who had not been challenged for cause or for hardship.[70] During phase two, small groups of approximately ten jurors would be instructed to be present in the lobby of the courtroom at staggered times throughout the day, and one-by-one the jurors would enter the courtroom for individual questioning.[71] The court would individually

---

[66] 1SR1 at 5.

[67] *Id.* at 4.

[68] *Id.*

[69] *Id.* at 5.

[70] *Id.*

[71] *Id.* at 7.

pose a set of 20 "community impact" questions[72] and 7

[72]The "community impact" questions consisted of the following:

1.      The charges in this case include allegations that the defendants were agents acting on behalf of the Republic of Cuba. Is there anything about that proposition that would affect your ability fairly and impartially to consider the evidence in this case and the court's instructions?

2.      Witnesses may be called in this case who have admitted to spying as agents for Cuba or who are members of the Cuban military or government. Would you automatically disbelieve such a witness regardless of their testimony or without comparing it with other witnesses or physical evidence in this case?

3.      Do you know of any reason why you may be prejudiced for or against the United States or the defendants because of the nature of the charges? Or because of any other reason?

4.      Have you ever lived in Cuba? Under what circumstances did you come to the United States? When did you leave? Did you have an exit visa?

5.      Have any of your family members or close friends lived in Cuba? Under what circumstances did they come to the United States?

6.      Do you have family or close friends living in Cuba at this time?

7.      Do you have any relatives or close friends who were ever politically involved in Cuba? When? What did they do?

8.      Have you, a member of your family, or a close friend traveled to Cuba?

9.      If you are chosen as a juror in this case, would you be concerned about returning a verdict of guilty or not guilty because of how other members of *your* community might view you?

10.     Can you return a verdict in this case based only on the evidence and the court's instructions, without being concerned over the impact the verdict might have on any individuals or community, in the United States, in Cuba, or anywhere?

11.     Do you have an opinion about the current government of Cuba? What is that opinion? How strong is that opinion? Will that opinion affect your ability to weigh the evidence and the court's instructions in this case fairly and with an open mind?

12.     Do you have an opinion about the way the United States handles its relations with Cuba? (for example the embargo against Cuba, the immigration policy or diplomatic relations) What is that opinion? How strong is that opinion? Will that opinion affect your ability to weigh the evidence and the court's instructions in this case fairly and with an open mind?

13.     Are you or a relative or close friend a member of a group whose principal purpose is to advocate a position about Cuba or American policy towards Cuba? What group? Have you ever contributed money or time to this group?

14.     Have you contributed money or time or do you support any of the following groups:
        P.U.N.D.
        Antonio Maceo Brigade
        Alpha 66
        Cuban Workers Alliance

"pretrial publicity" questions[73] to each juror.  These questions centered around

      Omega 7
      Miami Committee for Lifting the Cuban Embargo
      The Democracy Movement
      Brothers to the Rescue
      Cuban American National Foundation

15.     Do you have an opinion about the Cuban exile community in the United States?  What is that opinion?  How strong is that opinion?  Will that opinion affect your ability to weigh the evidence and the court's instructions in this case fairly and with an open mind?

16.     Do you have an opinion about the Elian Gonzalez case?  What is that opinion?  How strong is that opinion?  Will that opinion affect your ability to weigh the evidence and the court's instructions in this case fairly and with an open mind?  Do you understand that the facts in that case have nothing to do with the facts in this case?

17.     As a result of the Elian Gonzalez matter, certain members of the South Florida community, including some elected officials, publicly voiced their displeasure with the United States government's actions in that case.  Will those statements, or your own feelings about the case, affect your ability to give either the defendants or the United States a fair trial in this case?  If so, how?

18.     Can you listen to and fairly evaluate the testimony of an individual who is or was closely allied with the current government of Cuba?  Or who perhaps is or was a member of the communist party in Cuba?

19.     If you have negative feelings about any of these issues, can you put those feelings aside and decide this case based on the evidence presented and the instructions of law as given by the court?

20.     If you were the United States Attorney prosecuting this case, or if you were any of the defendants, or their counsel, do you know of any reason why you should not select yourself as a juror?

Gov't Br. at App. G.

[73]The "pretrial publicity" questions consisted of the following:

1.     What do you remember hearing, reading or seeing about this case in the news media?

2.     What was the source of the information?  Which newspaper/radio station/tv station[?]

3.     Has anyone ever talked to you about the facts of this case?  What additional information did you get from this source?

4.     Based on what you have heard or seen, have you formed any opinion as to whether the defendants are guilty or not guilty?  What is that opinion?  Have you ever expressed an opinion as to the guilt or non-guilt of the defendants?  To whom?

5.     A jury in a criminal case must base its verdict solely on the evidence presented at trial, and the instructions provided by the Court.  Can you put whatever statements you may have seen, heard or read out of your mind, and consider this case with an open mind,

more sensitive subjects, such as the jurors' media exposure, knowledge and opinions of the case, connections to Cuba, the United States policy toward Cuba, and the Cuban exile community in the United States.[74]  After the individual questioning, the parties would be permitted to exercise additional challenges for cause and hardship, if there were any, and peremptory challenges.[75]

On November 27, 2000, the trial began, and the voir dire proceeded as planned.[76]  During phase one, the court questioned 168 jurors through the oral voir dire and the written questionnaire to screen for language, hardship, and scheduling problems.[77]  The court questioned whether the jurors knew any of the parties, attorneys, or witnesses in the case, and questioned the jurors on their ability to

---

based solely on the evidence presented at trial and the instructions provided by the Court?

6.　　Jurors in this case will be instructed that they must not read, listen to or otherwise allow themselves to be exposed to any information, news reports, or public or private discussions about this case, unless and until they have been permanently discharged by Judge Lenard from serving on the jury.  Will you be able to follow such an instruction?

7.　　If you are chosen as a juror in this case will you be able to return a verdict of guilty or not guilty unaffected by the possibility that any verdict would receive news media attention?

*Id.*

[74]*See id.*

[75]1SR1 at 7.

[76]*See* R21.

[77]R21–R24.

reach a verdict based solely on the evidence and the court's instructions.[78]  Based on these generalized questions, the court struck 49 jurors for cause; 10 due to the court's concern over their ability to be fair and impartial because of their opinions regarding Cuba or their acquaintance with persons involved in the case, and the remaining 39 for hardship, health, or language problems.[79]

In phase two, the court individually questioned 82 prospective jurors.[80] Jurors who had heard media accounts about the case were asked to provide details regarding their exposure.[81]  The court asked probing questions to potential jury members who acknowledged having opinions about Cuba to determine whether those opinions would affect their ability to weigh the evidence and follow the court's instructions.[82]  As promised, the court asked additional, follow-up questions sua sponte and when the parties requested.[83]  At the conclusion of phase two, the court struck an additional 30 potential jurors for cause: 22 were struck for Cuba-related animus and the remaining 8 were dismissed for reasons unrelated to

---

[78]Id.

[79]Id.

[80]R25-28.

[81]Id.

[82]Id.

[83]Id.

attitudes about Cuba or the defendants.[84]

The court and the parties then proceeded to peremptory challenges.  The court twice granted the defendants' requests for additional peremptory challenges, giving the defendants a total of 18 and the government 11, and 2 each for alternates.[85]  However, the defendants exercised only 15 of their 18 challenges to the jury pool, as well as their two allotted alternate challenges, to excuse jurors whose answers revealed biases against them.[86]  The defendants struck every Cuban-American prospective juror, notwithstanding the government's reverse-*Batson* objection.[87]

The voir dire lasted seven days.  On each day of the voir dire, before every recess, and at the end of every day, the court admonished prospective jurors not to discuss the case amongst themselves or with others, not to have contact with anyone associated with the trial, and not to expose themselves, read, or listen to anything related to the case.[88]

During the lunch break on the first day of voir dire, the court observed that

---

[84]*Id.*

[85]1SR2 at 75; 1SR1 at 5-6, 11; R27 at 1382.

[86]R28 at 1513.

[87]*Id.* at 1508-11.

[88]*See* R21-28.

the family members of the victims of the Brothers to the Rescue shootdown were congregated in front of the press, immediately outside the courthouse.[89] The family members' statements were "fairly innocuous" in that they merely commented that "they were looking forward to the jury process going forward."[90] Some of the jurors were approached by the media as they were leaving the courthouse,[91] but they were not interviewed.[92] Regardless, the court instructed that it would no longer permit the victims' families to be present during voir dire "if there are efforts made to pollute the jury pool"[93] and instructed the government to speak to the victims' families regarding their conduct.[94] The court entered a sequestration order precluding witnesses from speaking with each other and with the media about the case.[95] It also extended the gag order to "all [trial] participants, lawyers, witnesses, family members of the victims" and clarified that it covered all "statements or information which is intended to influence public

---

[89]R7-978 at 3.

[90]R23 at 194.

[91]R21 at 111-12; R62 at 6575-76.

[92]R23 at 194.

[93]R21 at 113.

[94]*Id.*

[95]*Id.* at 117-19.

25

opinion or the jury regarding the merits of the case."[96]  The court thereafter

instructed the jurors to remove their juror tags as they left the courtroom, and

instructed the marshals to accompany the jurors out of the building.[97]  The court

sealed the voir dire questions during the jury selection so as to prevent the media

from accessing them.[98]

Later that day, when a copy of the Miami Herald, which contained an article

about the case, was found in the jury assembly room, the court ordered the

newspaper removed.[99]  The following day, Guerrero's counsel reported that he had

viewed one of the potential jurors reading the article while in the courtroom.[100]

The district court responded that "[t]he issue is not whether [venire] persons have

read or been exposed to publicity about the case of the defendants, but whether

they have formed an opinion based upon what they have read.  We will go into all

of this as we go through individual voir dires."[101]  Later, a potential juror who

---

[96]R7-978 at 3, 7; R64 at 6759-60.

[97]R21 at 112.

[98]R24 at 625-26.

[99]R21 at 171.

[100]R23 at 195-97.  This juror was later stricken for cause as a result of his personal knowledge of Jose Basulto, a Brothers to the Rescue pilot and witness in this case.  R24 at 537-40.

[101]R23 at 197.

evidenced prejudice was isolated and removed from the venire so as to eliminate contact with other potential jurors.[102]

The court also issued assigned seating in the courtroom.[103]  The government agents were assigned to the first row, the victims' families were seated in the second row and were removed from the government attorneys, the defendants' families were seated in the third row, and the back row was designated for the media.[104]

At the conclusion of voir dire, the district court empaneled the jury without objection.[105]  The defendants did not renew their motions for change of venue, despite the court's prior invitations.[106]  Instead, Medina's counsel complimented the manner in which the court conducted the voir dire stating, "The Court's conduct of this voir dire both in terms of its planning and its execution has been extraordinary.  What we have accomplished here in the last seven days or six days has been more than I think the defense anticipated we would be able to do."[107]  He

---

[102]*Id.* at 300-10.

[103]R25 at 717.

[104]*Id.*

[105]R29 at 1564.

[106]R5-586 at 17; R6-723 at 2-3.

[107]R27 at 1373.

added, "quite frankly, if Professor Moran could interrogate his pool members the way this Court has interrogated some of the prospective jurors, the social sciences wouldn't be soft sciences, they would be hard sciences."[108] He admitted, "[g]enerally . . . the people who prejudged or who had strong opinions were candid about them."[109] Later in the trial, when faced with the prospect of a juror being dismissed due to scheduling problems, the defendants vigorously objected without even knowing the juror's identity.[110] The court retained the juror at the defendants' insistence.[111] The defendants reiterated their satisfaction with the voir dire stating, "[w]e worked very hard to pick this jury and we got a jury we are very happy with."[112]

### D.    The Trial

At trial, the government presented evidence[113] that revealed that the

---

[108]*Id.* at 1374.

[109]*Id.* at 1375.

[110]R104 at 12094.

[111]*Id.*

[112]*Id.* at 12092.

[113]The original panel of this court will consider the remaining issues on appeal, including whether the government presented sufficient evidence to support the defendants' convictions. This brief discussion of the evidence is only meant to aid in the discussion of the change of venue and new trial issues.

Directorate of Intelligence, Cuba's primary intelligence collection agency, maintained a spy operation in South Florida known as "La Red Avispa," or the "The Wasp Network."[114]  Campa, Hernandez, and Medina were illegal intelligence officers of the operation and supervised agents, including agents Gonzalez and Guerrero.[115]  The Wasp Network reported information to Cuba on the activities of anti-Castro organizations in Miami-Dade County,[116] the operation of United States military installations,[117] and United States political and law enforcement activities.[118]  The operation was also directed to intimidate Cuban-American individuals and organizations with anonymous letters and threatening telephone calls;[119] to penetrate United States Congressional election activity;[120] to scout and assess potential sources of information and possible new recruits;[121] and to carry communications, cash, and other items between Miami and other United States-

[114]R44 at 3703-07.

[115]*Id.* at 3711-13, 3719-23.

[116]R45 at 3870-71.

[117]R74 at 7910, 7920-21; R46 at 4009-10.

[118]R103 at 11907-08, 11911-13.

[119]R45 at 3793-99.

[120]Govt. Ex. HF 143.

[121]Govt. Exs. DG 141 at 6-7; DAV 118 at 14-19.

based Directorate of Intelligence officers and agents.[122]  None of the defendants notified the United States Attorney General that they were acting as agents of the Cuban government.[123]

During the defendants' case, Hernandez called as a hostile witness Jose Basulto, founder of Brothers to the Rescue and the pilot of the only plane that escaped the February, 24, 1996, shootdown.[124]  After a series of questions about Basulto's travel outside of the United States, in which Hernandez's counsel suggested that Basulto had attempted to smuggle weapons into Cuba,[125] Basulto retorted, "Are you doing the work of the intelligence government of Cuba [?]"[126] Campa's attorney argued that Basulto's insinuation was "precisely the kind[] of problem[] that we were afraid of when we filed our motions for a change of venue . . . ."[127]  He argued, "This red baiting is absolutely intolerable, to accuse [Hernandez's attorney] because he is doing his job, of being a communist . . . . These jurors have to be concerned unless they convict these men of every count

---

[122]Govt. Exs. 384, 865.

[123]R61 at 6404-15.

[124]R80 at 8836-37.

[125]R81 at 8944-45.

[126]*Id.* at 8945.

[127]*Id.* at 8947.

lodged against them, people like Mr. Basulto who hold positions of authority in this community . . . are going to . . . accuse them of being Castro sympathizers . . . ."[128] The court struck Basulto's remark, admonished him, and instructed the jury to disregard the comment, noting that the remark was "inappropriate and unfounded" and that Hernandez's counsel was properly providing "a vigorous defense for his client."[129]

Throughout the trial, the defendants twice renewed their motions for change of venue through motions for a mistrial based on community events and trial publicity.[130] In February 2001, Campa moved for a mistrial based on activities during the weekend of February 24, 2001, to honor the fifth anniversary of the Brothers to the Rescue shootdown, including commemorative flights, as well as television interviews and newspaper articles regarding that event.[131] He argued that "some news events . . . are so great and are so explosive . . . that any amount of instructing the jury cannot cure the taint."[132] The government objected, noting that there was nothing in the record to indicate that the jury had ignored the court's

---

[128]*Id.* at 8947-48.

[129]*Id.* at 8945-46, 8955.

[130]R70 at 7130-36; R8-1009.

[131]R70 at 7130.

[132]*Id.* at 7131.

repeated admonitions that they not read or view case-related news accounts.[133]

The court granted the defendants' request for a juror inquiry, and asked if any one

of them had seen, heard, read, or been spoken to about any media accounts related

to this case, seeking a show of hands.[134]  The trial continued after no juror

responded affirmatively.[135]

On May 24, 2001, the district court denied the pending motions on the basis

of its earlier orders denying a change of venue and finding that "the February 24th

issues and events as well as the reporting of these events do not necessitate and

did not necessitate a change of venue . . . ."[136]  The court noted that "[t]he jurors

were instructed each and every day . . . at each and every break and at the

conclusion of the day . . . not to read or listen or see anything reflecting on this

matter in any way and there has been no indication that the jurors did not comply

---

[133]*Id.*

[134]*Id.* at 7136.

[135]*Id.* Two weeks later, on March 1, 2001, the defendants again filed a joint motion for a mistrial and change of venue, arguing that the events surrounding the anniversary of the Brothers to the Rescue shootdown "received a great deal of publicity, all of which was biased against the defendants and consistent with the government's position at trial."  R8-1009 at 2.  They maintained that "[n]o amount of voir dire or instructions to the jury [could] cure the taint, whose ripple effects are difficult to measure."  *Id.* at 5.  They also requested a mistrial "so that their trial can be conducted in a venue where community prejudices against the defendants are not so deeply embedded and fanned by the local media."  *Id.*

[136]R120 at 13894-95.

with that directive by the Court. . . ."[137]

During closing arguments, the government commented that Hernandez's attorney called the Brothers to the Rescue shootdown "the final solution" and noted that such terminology had been "heard . . . before in the history of mankind."[138]  It argued that the defendants were "bent on destroying the United States" and were "paid for by the American taxpayer."[139]  It summarized that the defendants had joined a "hostile intelligence bureau . . . that sees the United States of America as its prime and main enemy" and that the jury was "not operating under the rule of Cuba, thank God."[140]  The defense objections throughout the closing arguments were sustained.[141]  The district court instructed the jury to consider only the evidence admitted during the trial, and to remember that the lawyers' comments were not evidence.[142]

For deliberations, the jury was moved to another floor of the courthouse

---

[137]*Id.* at 13895.

[138]R124 at 14474.

[139]*Id.* at 14482.

[140]*Id.* at 14475.

[141]*Id.* at 14482, 14483, 14493.

[142]R125 at 14583.

with controlled access.[143]  No one but the court staff was permitted on the floor.[144]

The court also denied the media's request for the names of the twelve jurors.[145]

When the jurors were filmed leaving the courthouse one day during deliberations,

the court modified the jurors' entry and their exit from the courthouse to prevent

further exposure to the media.[146]  The court provided the jurors transportation to

and from their vehicles or mass transit and brought them up to their secured floor

through the courthouse garage.[147]  The jury deliberated for five days.[148]  The

defendants were convicted on June 8, 2001.[149]

### E.    Post-Trial Motions for Change of Venue and for New Trial

In July and August of 2001, the defendants reasserted their claims of

improper venue in post-trial motions for judgment of acquittal and for new trial.[150]

They argued a new trial was merited "in the interest of justice" because of the

---

[143]R124 at 14546-47; R125 at 14624.

[144]R125 at 14624.

[145]R126 at 14643-44.

[146]*Id.* at 14645-47.

[147]*Id.* at 14647.

[148]R125-R126.

[149]R126 at 14668-69.

[150]R12–1338, 1342, 1343, 1347.

prejudice inured to them from the venue and the prosecution's misconduct.[151]

Guerrero argued that, although he did "not seek to criticize the Court's voir dire procedure nor could he," the jurors' responses in voir dire were "'politically correct,'" in that they "all agreed that they would be fair and impartial."[152]  Medina similarly argued that, "[d]espite the extraordinary care this Court exercised in the jury selection process," a fair and impartial jury could not be seated in Miami-Dade County.[153]  Campa and Gonzalez argued that witness Jose Basulto's remarks were highly prejudicial because they implied that Defendant Hernandez's counsel was a spy for the Cuban government.[154]  Campa also asserted that the jury's quick verdicts without asking a single question in the complex, almost seven-month trial indicated that the jury was subject to community pressure and prejudice.[155]  He further argued that the government prejudiced the defendants by stating in closing argument that they "were 'people bent on destroying the United States' whose defense had been 'paid for by the American taxpayer.'"[156]

---

[151]R12-1338 at 2-3.

[152]*Id.* at 2.

[153]R12–1347 at 1.

[154]R12–1342 at 3; R12–1343 at 3-4.

[155]R12–1343 at 1-3.

[156]*Id.* at 8.

On November 28, 2001, the district court denied the motions for new trial in a detailed written order.[157] It referenced its prior orders denying a change of venue and denying reconsideration of the denial of the change of venue, and stated that because it was "[a]ware of the impassioned Cuban exile-community residing within this venue, the Court implemented a series of measures to guarantee the Defendants' right to a fair trial."[158] These efforts included a searching, seven-day voir dire process, daily instructions to the jury not to speak with the media about the case or to read or listen to any reports about the case, and gag orders on all trial participants.[159] The court also struck witness Jose Basulto's statement and instructed the jury to disregard it.[160] The court found that the jury's prompt, inquiry-free verdict at most was speculative, circumstantial evidence of the venue's impact on the jury.[161] The court concluded that "any potential for prejudice . . . was cured" "through the Court's methodical, active pursuit of a fair trial from voir dire, to the presentation of evidence, to argument, and concluding

[157]R13–1392.

[158]*Id.* at 14.

[159]*Id.*

[160]*Id.*

[161]*Id.* at 15.

with deliberations and the return of verdict."[162] As to the defendants' claims of prosecutorial misconduct, the court found that it upheld each of defense counsel's objections and specially instructed the jury that it was to disregard the improper statements.[163] In light of the entire record, the interests of justice did not merit a new trial.[164]

On November 12, 2002, the defendants renewed their motion for a new trial on two grounds: newly discovered evidence and the interests of justice.[165] They argued that they were entitled to a new trial based on the government's motion for change of venue filed June 25, 2002, in the case of *Ramirez v. Ashcroft*,[166] a Title VII action brought by a Hispanic employee of the INS.[167] Ramirez alleged he was subjected to a hostile work environment, unlawful retaliation, and intimidation by his employer as a result of the INS's removal of Elian Gonzalez from the United

---

[162]*Id.*

[163]*Id.* at 15-16.

[164]*Id.* at 17. In December 2001, Guerrero, Hernandez, and Medina were sentenced to life, Campa was sentenced to 228 months, and Gonzalez was sentenced to 15 years. R14-1430, 1435, 1437, 1439, 1445. After sentencing, the defendants appealed.

[165]R15–1635, 1638, 1644, 1647, 1650, 1651.

[166]No. 01-4835 (S.D. Fla. June 25, 2002).

[167]R15-1635 at 8-11.

States and his return to his father in Cuba on April 22, 2000.[168]  According to the

defendants, the government's decision to seek a change of venue in *Ramirez,*

based upon the alleged prejudicial effect of the pervasive community sentiment

following the custody battle over Elian Gonzalez, constituted newly discovered

evidence of prosecutorial misconduct because the same United States Attorney

opposed the defendants' repeated motions for change of venue in the instant case

and misrepresented the pervasive community prejudice in the Miami

community.[169]  In support of this argument, the defendants filed the government's

*Ramirez* motion for change of venue, in which it argued that "the Miami-Dade

community has developed and maintains strong emotional feelings and opinions

regarding the handling of the Elian Gonzalez affair by INS and the Attorney

General's office."[170]  The government asserted, "it is extremely unlikely that a

venire from Miami-Dade County would be able to put aside such deeply held

opinions and feelings and afford the [government] a fair trial . . . ."[171]

The defendants further argued that a new trial should be granted in the

_____

[168]R15-1636 at Ex.2 at 1-2.

[169]R15-1635 at 8-11.

[170]R15–1636 at Ex. 2 at 16.

[171]*Id.*

interests of justice.[172]  They argued that surveys of the Miami-Dade community,

the responses given by prospective jurors during voir dire, and the atmosphere

surrounding the voir dire demonstrated that a fair and impartial jury could not be

selected in this case.[173]  In support, they filed an affidavit by legal psychologist Dr.

Kendra Brennan and a study by Florida International University's Professor of

Sociology and Anthropology Dr. Lisandro Pérez.[174]  Dr. Brennan evaluated

Professor Moran's survey and concluded that it "accurately reflect[ed] profound

existing bias against those associated with the Cuban government in Miami-Dade

County."[175]  Dr. Pérez concluded that "the possibility of selecting twelve citizens

of Miami-Dade County who can be impartial in a case involving acknowledged

agents of the Cuban government is virtually zero."[176]  The defendants also

supported their interests of justice argument with news articles and reports by

Human Rights Watch, which addressed the harassment, intimidation, and violence

that Miami Cuban exiles suffered for expressing moderate political views toward

---

[172]R15–1635 at 12-32.

[173]*Id.*

[174]R15-1636 at Exs. 4,5.

[175]*Id.* at Ex. 4 at 8.

[176]*Id.* at Ex. 5 at 2-3.

Castro or Cuban relations.[177]

The district court denied the renewed motion for new trial holding that the government's decision to move for a change of venue in *Ramirez* did not constitute newly discovered evidence of prosecutorial misconduct with respect to the government's opposition to the defendants' motions for change of venue in this case.[178]  The court reasoned that *Ramirez* differed from this case in that it "related directly to the INS's handling of the removal of Elian Gonzalez from his uncle's home, an event which, it is arguable, garnered much more attention here in Miami and worldwide than this case."[179]  The government's position in *Ramirez* "was premised specifically upon the facts of that case," including the fact that Ramirez "had stirred up extensive publicity in the local media focusing directly on the facts he alleged in the lawsuit . . . ."[180]  The court also ruled that it lacked jurisdiction to grant a new trial based on the defendants' interests of justice argument because such a motion must be filed within seven days after the guilty verdict, or within an extension of time granted by the trial judge.[181]  This time

---

[177]*Id.* at Exs. 7-10, 12.

[178]R15–1678 at 8.

[179]*Id.* at 8-9.

[180]*Id.* at 9.

[181]*Id.* at 5.

period had expired more than 19 months before the motion was filed, and therefore, the court declined to consider that argument, or any of its supporting exhibits.[182]

In a published opinion addressing only the motions for change of venue and motions for a new trial, a panel of this court concluded that the defendants were entitled to a pretrial change of venue and were denied a fair trial because of the "perfect storm" created by the pretrial publicity surrounding this case, the pervasive community sentiment, and the government's closing arguments.[183]  We vacated the panel opinion and granted the government's petition for rehearing en banc to consider whether the defendants were denied a fair and impartial trial.[184]

## II.  DISCUSSION

On appeal, we first consider whether the district court abused its discretion in denying the defendants' Rule 21 motion for change of venue for failure to make a sufficient showing of prejudice due to either pretrial publicity or pervasive community prejudice.  The second issue we consider is whether the court abused its discretion in denying their Rule 33 motions for new trial based on newly

---

[182] *Id.* at 6.

[183] *United States v. Campa*, 419 F.3d 1219 (11th Cir.) (per curiam), *reh'g granted, vacated*, 429 F.3d 1011 (11th Cir. 2005) (per curiam).

[184] *Id.*

41

discovered evidence and the interests of justice.

## A. Denial of Motions for Change of Venue

We review a district court's denial of a Rule 21 motion for change of venue for an abuse of discretion.[185]  Rule 21 provides that, "[u]pon the defendant's motion, the court must transfer the proceeding . . . to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."[186]  A defendant can establish that prejudice against him prevented him from receiving a fair trial and necessitated a change of venue by two methods.  He can demonstrate that a fair trial was impossible because the jury was actually prejudiced against him.[187]  Or, he can show that juror prejudice should have been presumed from prejudice in the community and pretrial publicity.[188]  Here, the defendants argue that a presumption of prejudice was warranted because of the pervasive community prejudice against the Cuban government and its agents and the pretrial publicity that existed in Miami.

---

[185] *United States v. Smith*, 918 F.2d 1551, 1556 (11th Cir. 1990).

[186] Fed. R. Crim. P. 21(a).

[187] *Irvin v. Dowd*, 366 U.S. 717, 727, 81 S. Ct. 1639, 1645, 6 L. Ed. 2d 751 (1961).

[188] *Rideau v. Louisiana*, 373 U.S. 723, 726-27, 83 S. Ct. 1417, 1419-20, 10 L. Ed. 2d 663 (1963).

A district court must presume that so great a prejudice exists against the defendant as to require a change of venue under Rule 21 if the defendant shows: (1) that widespread, pervasive prejudice against him and prejudicial pretrial publicity saturates the community where he is to be tried and (2) that there is a reasonable certainty that such prejudice will prevent him from obtaining a fair trial by an impartial jury.[189] The presumed prejudice principle is "'rarely' applicable" and is reserved for an "extreme situation."[190] "[T]he burden placed upon the [defendant] to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one."[191] Once the defendant puts forth evidence of the pervasive prejudice against him, the government can rebut any presumption of juror prejudice by demonstrating that the district court's careful and thorough voir dire, as well as its use of prophylactic measures to insulate the jury from outside influences, ensured that the defendant received a fair

[189]*See Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S. Ct. 1507, 1522, 16 L. Ed. 2d 600 (1966) ("[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity."); *Pamplin v. Mason*, 364 F.2d 1, 5 (5th Cir. 1966) ("Where outside influences affecting the community's climate of opinion as to a defendant are inherently suspect, the resulting probability of unfairness requires suitable procedural safeguards, such as a change of venue, to assure a fair and impartial trial.").

[190]*Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir. 1980) (citing *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554, 96 S. Ct. 2791, 2800, 49 L. Ed. 2d 683, 694 (1976), *Hale v. United States*, 435 F.2d 737, 747 (5th Cir. 1970)).

[191]*Coleman v. Kemp*, 778 F.2d 1487, 1537 (11th Cir. 1985).

trial by an impartial jury.[192]

### 1.    The News Articles

Here, the district court concluded that the defendants failed to present evidence sufficient to raise a presumption of prejudice against them that would impair their right to a fair trial by an impartial jury.[193]  In support of their motion for change of venue, the defendants first relied on numerous news articles, which they argued demonstrated that the community atmosphere was "so pervasively inflamed" that it would impair any juror's ability to reach a fair verdict.[194]

The district court did not abuse its discretion in finding that the pretrial publicity was not "'so inflammatory and pervasive as to raise a presumption of prejudice.'"[195]  Prejudice against a defendant cannot be presumed from pretrial publicity regarding peripheral matters that do not relate directly to the defendant's guilt for the crime charged.[196]  In fact, we are not aware of any case in which any

---

[192]*See id.* at 1541, n.25; *Mayola*, 623 F.3d at 1000-01.

[193]R5-586 at 16.

[194]R2-317 at 3.

[195]R5-586 at 11 (quoting *Ross v. Hopper*, 716 F.2d 1528, 1541 (11th Cir. 1983)).

[196]*See United States v. Awan*, 966 F.2d 1415, 1428 (11th Cir. 1992); *see also Meeks v. Moore*, 216 F.3d 951, 963 n.19, 967 (11th Cir. 2000) (ruling that only media reports linked directly to the defendant had "evidentiary value" in assessing his presumed prejudice claim, which failed absent a showing that "bias played any part in his convictions").

court has ever held that prejudice can be presumed from pretrial publicity about issues other than the guilt or innocence of the defendant.[197]

Moreover, the Supreme Court has ruled that we cannot presume prejudice in the absence of a "trial atmosphere . . . utterly corrupted by press coverage."[198] The Court distinguished between publicity that is "largely factual publicity" and "that which is invidious or inflammatory," in *Murphy v. Florida*,[199] a case in which the Court ruled that the defendant was not denied due process when he was denied a change of venue, despite extensive publicity about the defendant's crime and criminal history. The Court found that there was no inflamed community atmosphere because the news articles appeared seven to twenty months before the jury was selected and the articles were largely factual in nature.[200] The Court also

[197]*See Awan*, 966 F.2d at 1428.

[198]*Dobbert v. Florida*, 432 U.S. 282, 303, 97 S. Ct. 2290, 2303, 53 L. Ed. 2d 344, 362 (1977) (alteration in original) (internal quotation marks omitted) (quoting *Murphy v. Florida*, 421 U.S. 794, 798, 95 S. Ct. 2031, 2035, 44 L. Ed. 2d 589 (1975)).

[199]421 U.S. 794, 800 n.4, 95 S. Ct. 2031, 2036 n.4.

[200]*Id.* at 802, 95 S. Ct. at 2037; *see also Spivey v. Head*, 207 F.3d 1263, 1270-71 (11th Cir. 2000) (ruling that the defendant failed to establish that pretrial publicity was sufficiently prejudicial or inflammatory to require a change of venue because the numerous newspaper articles that the defendant put forth were either published years before the trial or only obliquely mentioned his case, and because the prejudicial articles were not typical or widespread); *United States v. De La Vega*, 913 F.2d 861, 865 (11th Cir. 1990) (ruling that the 330 articles submitted by the defendants were largely factual and could not have created an inflamed community atmosphere sufficient to presume prejudice in the Miami-Dade community of 1.8 million people).

distinguished between jurors' "mere familiarity [with the defendant and his past crimes] and an actual predisposition against him."[201] Some of the jurors had a vague recollection of the alleged crime, but none believed that the defendant's past crimes were connected to the present case, nor did the voir dire indicate that the jurors were prejudiced against him.[202] Therefore, the defendant failed to show that the trial was "inherently prejudicial" or that the jury selection process permitted an "inference of actual prejudice."[203]

Here, the news materials submitted by the defendants fall far short of the volume, saturation, and invidiousness of news coverage sufficient to presume prejudice. Of the numerous articles submitted, very few related directly to the defendants and their indictments.[204] The articles primarily concerned subjects such as the community tensions and protests related to general anti-Castro sentiment, the conditions in Cuba, and other ongoing legal cases, such as the Elian Gonzalez matter.[205] Of the articles about the Brothers to the Rescue shootdown, most were published approximately one year before the court first ruled on the

---

[201] *Murphy*, 421 U.S. at 800 n.4, 95 S. Ct. at 2036 n.4.

[202] *Id.* at 800-01, 95 S. Ct. at 2036.

[203] *Id.* at 803, 95 S. Ct. at 2037.

[204] *See* R2-317, 321, 324, 334, 329; R3-397, 455.

[205] *See id.*

change of venue motion.[206] Therefore, the few articles that did relate to the defendants and their alleged activities in particular were too factual and too old to be inflammatory or prejudicial. Moreover, the record reflects that not a single juror who deliberated on this case indicated that he or she was in any way influenced by news coverage of the case.[207] Nor does the record reflect that any one of them had formed an opinion about the guilt or innocence of the defendants before the trial began.[208] In fact, most of the venire revealed that they were either entirely unaware of the case, or had only a vague recollection of it.[209] "To ignore the real differences in the potential for prejudice would not advance the cause of fundamental fairness, but only make impossible the timely prosecution of persons who are well known in the community, whether they be notorious or merely prominent."[210] Accordingly, the defendants have failed to demonstrate that this trial was "utterly corrupted by press coverage."[211]

## 2. The Moran Survey

---

[206]*See id.*

[207]*See* R21-28.

[208]*See id.*

[209]*See id.*

[210]*Murphy*, 421 U.S. at 800 n.4, 95 S. Ct. at 2036 n.4.

[211]*See id.* at 798, 95 S. Ct. at 2035.

The district court also considered the results of the random survey of 300 registered Miami-Dade voters conducted by Professor Moran, which was purportedly designed to examine prejudice against anyone alleged to have assisted the Cuban government in espionage activities.[212]  According to Professor Moran, the survey indicated that "the only viable means of assuring the defendant a fair and impartial jury" was to transfer the case out of the Miami District of the Southern District of Florida.[213]  The court declined to afford the survey and Professor Moran's conclusions substantial weight in determining whether to change the venue, but invited the defendants to renew their motions for change of venue if the voir dire showed that an impartial jury could not be empaneled.[214]

It was entirely within the district court's prerogative to reject outright Professor Moran's survey as a basis upon which to grant a motion to change venue.  The record reflects that the district court carefully considered the survey and Professor Moran's conclusions, finding six specific reasons why the survey was unpersuasive.[215]  The strongest support for the court's conclusion was the fact

---

[212]R5-586 at 13-15.

[213]R2-321 at Ex. A at 16.

[214]R5-586 at 13-15.

[215]*Id.*

that Moran relied on the very same survey that we previously rejected in *Fuentes-Coba* as a basis for his conclusion that a substantial prejudice existed in the Southern District of Florida against defendants alleged to have helped the Castro government.[216] Moreover, the survey was riddled with non-neutral questions, such as the question that asked the respondent to agree or disagree whether "Castro's agents have attempted to disrupt peaceful demonstrations such as the Movimiento Democracia's flotillas which honor fallen comrades."[217] The survey was too ambiguous to be reliable. For example, it asked if there are "any circumstances" that would change the respondent's "opinion," but it did not clarify to which "opinion" the question refers.[218] Moreover, only two questions in the entire survey directly referenced the defendants.[219]

Our deferential standard of review requires us to affirm the district court's

---

[216]*Id.*

[217]*Id.*

[218]*Id.*

[219] *See* R2-321 at Ex. D. The dissent argues that the district court focused its analysis solely on prejudicial publicity and failed to make any findings regarding prejudice within the community. We disagree with this characterization of the district court's ruling. The court "construe[d] [the] [d]efendants' Motions [for change of venue] as directed *primarily* toward the issue of 'pervasive community prejudice' . . . ." R5-586 at 10, n.2 (emphasis added). And, while the court did not go so far as to find the community was "heterogenous" and "highly diverse," as the government argued, R3-443 at 3, the court did make a specific finding as to prejudice in the community: that the defendants' evidence did not demonstrate that community prejudice warranted a change of venue under Rule 21. R5-586 at 16.

49

conclusion that the Moran survey was not sufficiently persuasive to support a motion for change of venue. "The well established rule vests substantial discretion in the district court as to the granting or denying of a motion for transfer . . . ."[220] "The trial court is necessarily the first and best judge of community sentiment and the indifference of the prospective juror. Appellate courts . . . will interfere only upon a showing of manifest probability of prejudice."[221]

Furthermore, the court's decision to deny the defendants' pretrial change of venue motions without prejudice in favor of proceeding to voir dire was a well-supported exercise of discretion. When a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity.[222] Once the court has conducted an appropriate voir dire examination, it also has the broad discretion to rule whether prejudice resulted from the pretrial publicity such that the defendant would be denied a fair trial.[223] Indeed, we have ruled that a trial

---

[220]*United States v. Williams*, 523 F.2d 1203, 1208 (5th Cir. 1975).

[221]*Bishop v. Wainwright*, 511 F.2d 664, 666 (5th Cir. 1975).

[222]*See United States v. Nix*, 465 F.2d 90, 96 (5th Cir. 1972).

[223]*See id.*

50

court's method of holding its decision on a Rule 21 motion for change of venue in abeyance until the conclusion of the voir dire "is clearly the preferable procedure."[224]  Even the defendants themselves admitted that the district court's voir dire more thoroughly evaluated the sentiment of the Miami-Dade community. They admitted, "quite frankly, if Professor Moran could interrogate his pool members the way this Court has interrogated some of the prospective jurors, the social sciences wouldn't be soft sciences, they would be hard sciences."[225]

### 3.    The Voir Dire

The voir dire in this case was a model voir dire for a high profile case.  The court conducted a meticulous two-phase voir dire stretching over seven days.[226]  In contrast to the generalized, pre-fabricated, and sometimes leading questions of Professor Moran's survey were the detailed and neutral voir dire questions that the court carefully crafted with the parties' assistance.[227]  In the first phase of voir dire, the court screened 168 prospective jurors for hardship and their ability to reach a verdict based solely on the evidence.[228]  In the second phase, the court extensively

---

[224]*Williams*, 523 F.2d at 1209 n.10.

[225]R27 at 1374.

[226]R21-28.

[227]Gov't Br. at App. G.

[228]R6-766; R21-R24.

and individually questioned 82 prospective jurors outside the venire's presence regarding sensitive subjects, such as involvement in pro- and anti-Castro political groups and immigration into the United States from Cuba.[229] Phase two questioning revealed that most of the prospective jurors, and all of the empaneled jurors, had been exposed to little or no media coverage of the case.[230] Those who had been exposed to media coverage of the case vaguely recalled a "shootdown," but little else.[231] Ultimately, the court struck 32 out of 168 potential jurors (19%) for Cuba-related animus, which was well within an acceptable range.[232] Qualified jurors need not be totally ignorant of the facts and issues involved:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay

---

[229]R25-28.

[230]*See id.*

[231]*See id.*

[232]*Compare Patton v. Yount,* 467 U.S. 1025, 1029, 1035, 104 S. Ct. 2885, 2888, 2891, 81 L. Ed. 2d 847, 853, 856 (1984) (holding that the trial court did not err in finding that the jury was impartial, even though "77% [of the venire] admitted they would carry an opinion in to the jury box," because the "relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially"), *and Murphy,* 421 U.S. at 803, 95 S. Ct. at 2038 (holding that excusing 20 out of 78 prospective jurors [or, 26%] "by no means suggests a community with sentiment so poisoned against [the defendant] as to impeach the indifference of jurors who displayed no animus of their own"), *with Irvin*, 366 U.S. at 727, 81 S. Ct. at 1645 (reversing the defendant's conviction because 268 of the 430 venirepersons, or 62%, had fixed opinions regarding the defendant's guilt).

aside his impression or opinion and render a verdict based on the evidence presented in court.[233]

At the conclusion of the voir dire, the defendants failed to express any dissatisfaction with the selected jurors in terms of their ability to serve fairly and impartially,[234] and even complimented the court's voir dire as "extraordinary"[235] and stated that they were "very happy with" the jury.[236]  The court's voir dire was so effective in screening potential jurors that the defendants did not exercise all of their peremptory challenges.[237]  We have ruled that a defendant's failure to use all peremptory challenges "indicates the absence of juror prejudice."[238]  Moreover, the defendants failed to renew their change of venue motions at the end of the voir dire, despite the court's invitation to do so, further indicating their satisfaction with the jury and a lack of juror prejudice.[239]  Accordingly, the court's careful and thorough voir dire rebutted any presumption of jury prejudice.[240]

---

[233]*Irvin*, 366 U.S. at 722-23, 81 S. Ct. at 1642-43.

[234]R29 at 1564.

[235]R27 at 1373.

[236]R104 at 12092.

[237]R28 at 1513.

[238]*United States v. Alvarez*, 755 F.2d 830, 859 (11th Cir. 1985).

[239]*United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003).

[240]*See Coleman*, 778 F.2d at 1541 n.25; *Mayola*, 623 F.2d at 1000-01.

"A trial court's finding of juror impartiality may 'be overturned only for manifest error.'"[241] We owe the district court "wide discretion" in "conducting voir dire in the area of pretrial publicity and in other areas that might tend to show juror bias."[242] "The judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation any of such claim his own perception of the depth and extent of news stories that might influence a juror."[243]

In sum, the record in this case amply demonstrates that the district court took extraordinary measures to carefully select a fair and impartial jury. The court extensively and individually questioned the prospective jurors, repeatedly cautioned them not to read anything or talk to anyone about the case, insulated the jurors from media publicity, provided the defendants with extra peremptory challenges, struck 32 persons for cause, and struck all of the Cuban-Americans

---

[241]*Mu'Min v. Virginia*, 500 U.S. 415, 428, 111 S. Ct. 1899, 1907, 114 L. Ed. 2d 493, 508 (1991) (quoting *Patton*, 467 U.S. at 1031, 104 S. Ct. at 2889).

[242]*Id.* at 427, 111 S. Ct. at 1906.

[243]*Id.* The dissent suggests that the "plethora of media" and "ubiquitous electronic communications devices" that characterize this "high-tech age" spread community prejudice across the district, necessitating a change in venue. We think, however, that such advances in communication technology support the opposite conclusion. If prejudice could be spread through multiple forms of media, the spread of such prejudice would not stop at district lines, but would extend across the state of Florida. Following that rationale, the district court should have refused to change venue because a district outside Miami-Dade would have been no more capable of producing a panel of impartial jurors than Miami-Dade itself. This is why we afford deference to the district court's assessment of juror credibility and impartiality.

over the government's *Batson* objection.[244]  Under these circumstances, we will not disturb the district court's broad discretion in assessing the jurors' credibility and impartiality.

### 4.    The Trial

A review of the record reveals that this trial "comported with the highest standards of fairness and professionalism."[245]  The court maintained strict control over the proceedings by employing various curative measures to insulate the jury from any outside influence, from the beginning of the trial to the jury's verdict. From the commencement of the case, the parties, counsel, and witnesses were under a strict gag order, as well as a sequestration order, which prohibited them from releasing information or opinion that would interfere with the trial or otherwise prejudice the defendants.[246]  On each day of the trial, before every recess, and at the end of every day, the court admonished the jurors not to discuss the case amongst themselves or with others, not to have contact with anyone

---

[244]The government objected to the striking of all Cuban-Americans, the district court denied the *Batson* challenge, and the government has not raised that issue in any way. Accordingly, we have no opportunity to review the propriety of striking all the members of a particular nationality.  We simply note that although the defendants challenge their convictions based on an alleged pervasive anti-Cuban sentiment in the Southern District of Florida, every Cuban-American was struck from the venire.

[245]*Alvarez*, 755 F.2d at 859.

[246]2SR1-122 at 1; R21 at 117-19; R7-978 at 3, 7; R64 at 6759-60.

associated with the trial, and not to expose themselves, read, or listen to anything related to the case.[247] The court maintained control over the seating in the courtroom as well, designating certain rows to certain groups and requiring the media to sit in the back row.[248] The court prevented the media from accessing the voir dire questions by sealing them during jury selection.[249]

The court fiercely guarded the jury from outside intrusions. From the first day of trial, the court instructed the marshals to accompany the jury, with their juror tags removed, as they left the building.[250] The court rejected the media's request for the twelve jurors' names.[251] The court took extra steps to insulate the jurors during their deliberations, arranging for them to enter the courthouse by a private entrance and providing them with transportation to their vehicles or mass transit.[252]

### 5.    Supreme Court Precedent

This case was nothing like the cases in which the Supreme Court has

---

[247] *See* R21-28.

[248] R25 at 717.

[249] R24 at 625-26.

[250] R21 at 112.

[251] R126 at 14643-44.

[252] *Id.* at 14645-47.

previously found that defendants were denied a fair trial by an impartial jury because of pretrial publicity or pervasive community prejudice. The record reflects that the pretrial community atmosphere in this case was unlike that which existed in *Irvin v. Dowd*. In that case, the rural, Indiana community of 30,000 where the defendant was tried was subjected to a barrage of inflammatory publicity immediately before trial, including information on the defendant's prior convictions, his confession to 24 burglaries and six murders, including the one for which he was tried, and his unaccepted offer to plead guilty in order to avoid the death sentence.[253] The Supreme Court ruled that the defendant was entitled to a change of venue because the prejudice against him was "clear and convincing," as reflected by the fact that eight of the twelve jurors had formed an opinion that he was guilty before the trial began.[254]

Also distinguishable from this case is *Rideau v. Louisiana*,[255] a case in which the police illegally obtained a confession from the defendant, which a local television station filmed and broadcast three times in the community where the crime and the trial occurred. "[W]ithout pausing to examine a particularized

---

[253]*Irvin*, 366 U.S. at 725-27, 81 S. Ct. at 1644-45.

[254]*Id.*

[255]373 U.S. at 724, 83 S. Ct. at 1418.

transcript of the voir dire examination of members of the jury," the Supreme Court overturned the conviction, holding that the widespread dissemination of this highly damaging material rendered the defendant's trial nothing more than "a hollow formality."[256] The Court ruled that the "kangaroo court proceedings" deprived the defendant of due process.[257]

The district court's implementation of numerous curative measures to insulate the jury from disruptive influences in this case also sits in stark contrast to the "carnival atmosphere" that warranted a reversal of the defendant's conviction in *Sheppard v. Maxwell*.[258] In *Sheppard*, the judge did not adequately direct the jury not to read or listen to anything concerning the case, but merely suggested that the jury not expose themselves to media reports.[259] The jurors were "thrust into the role of celebrities by the judge's failure to insulate them from the reporters and photographers," when numerous pictures of the jurors and their addresses appeared in the newspaper.[260] Likewise, in *Estes v. Texas*,[261] the defendant was

---

[256]*Id.* at 726-27, 83 S. Ct. at 1419-20.

[257]*Id.* at 726, 83 S. Ct. at 1419.

[258]384 U.S. 333, 358, 86 S. Ct. 1507, 1520, 16 L. Ed. 2d 600 (1966).

[259]*Id.* at 353, 86 S. Ct. at 1517.

[260]*Id.*

[261]381 U.S. 532, 550, 85 S. Ct. 1628, 1636, 14 L. Ed. 2d 543, 554 (1965).

denied his due process rights because the courtroom was a "mass of wires, television cameras, microphones, and photographers." At least twelve cameramen were allowed to photograph the proceedings, "[c]ables and wires were snaked across the courtroom floor, three microphones were on the judge's bench and others were beamed at the jury box and the counsel table."[262]

The rare instances in which the Supreme Court has presumed prejudice to overturn a defendant's conviction are far different from this case. In those cases, the "kangaroo court proceedings" in combination with the "circus atmosphere" generated by sensational pretrial publicity deprived the defendant of a fair trial. Here, the district court carefully and meticulously evaluated the defendants' evidence of pretrial publicity and then made specific factual findings to discount that evidence. At trial, the court used numerous curative measures to prevent any publicity from affecting the jury's deliberations.

In sum, to establish a presumption of juror prejudice necessitating Rule 21 change of venue, a defendant must demonstrate that (1) widespread, pervasive prejudice and prejudicial pretrial publicity saturates the community, and (2) there is a reasonable certainty that the prejudice prevents the defendant from obtaining a fair trial. We find that the defendants in this case failed to meet this two-pronged

---

[262]*Id.* at 536, 85 S. Ct. at 1629.

test. They failed to show that so great a prejudice existed against them as to require a change of venue under Rule 21, in light of the court's effective use of prophylactic measures to carefully manage individual voir dire examination of each and every panel member and its successful steps to isolate the jury from every extrinsic influence. Under these circumstances, we will not disturb the district court's broad discretion in ruling that this is not one of those rare cases in which juror prejudice can be presumed.

## B. Denial of Motions for New Trial

We review a district court's denial of a motion for new trial for abuse of discretion.[263] Rule 33 of the Federal Rules of Criminal Procedure provides:

> (a) Defendant's Motion. Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.
> (b) Time to File.
>     (1) Newly Discovered Evidence. Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.
>     (2) Other Grounds. Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty.[264]

---

[263] *United States v. Vallejo*, 297 F.3d 1154, 1163 (11th Cir. 2002).

[264] Fed. R. Crim. P. 33. Rule 33 was amended December 1, 2002, "as a part of the general restyling of the Criminal Rules to make them more easily understood and to make style and

60

Thus, there are two grounds upon which a court may grant a motion for new trial: one based on newly discovered evidence, which must be filed within three years of the verdict pursuant to Rule 33(b)(1); and the other based on any other reason, typically the interest of justice, which must be filed within seven days of the verdict, pursuant to Rule 33(b)(2).[265]

"Motions for a new trial based on newly discovered evidence are highly disfavored in the Eleventh Circuit and should be granted only with great caution. Indeed, the defendant bears the burden of justifying a new trial."[266] Newly discovered evidence need not relate directly to the issue of guilt or innocence to justify a new trial, "but may be probative of another issue of law."[267] For instance, the existence of a *Brady* violation, as well as questions regarding the fairness or impartiality of a jury, may be grounds for a new trial.[268]

---

terminology consistent throughout the rules. These changes [were] intended to be stylistic only." *See* Fed. R. Crim. P. 33 advisory committee's note 2002. We apply the current version of Rule 33, even though the defendants' new trial motions were filed before the 2002 amendments were effective.

[265] *See* Fed. R. Crim. P. 33; *United States v. Devila*, 216 F.3d 1009, 1015 (11th Cir. 2000) (per curiam) *vacated in part on other grounds*, 242 F.3d 995, 996 (2001) (per curiam).

[266] *Devila,* 216 F.3d at 1015-16 (quotations and citations omitted).

[267] *United States v. Beasley*, 582 F.2d 337, 339 (5th Cir. 1978) (per curiam).

[268] *Id.* at 339; *United States v. Williams*, 613 F.2d 573, 575 (5th Cir. 1980) (stating that a motion for new trial is appropriate if the newly discovered evidence "afford[ed] reasonable

The defendants are not entitled to a new trial on the basis of newly discovered evidence under Rule 33(b)(1) because the government's decision to move for a change of venue in *Ramirez* does not constitute newly discovered evidence of prosecutorial misconduct with respect to the government's earlier opposition to the defendants' motions for change of venue in this case. *Ramirez* was entirely different from this case in that it was a Title VII employment discrimination case arising out of the INS's role in the removal of Elian Gonzalez from his uncle's home, whereas this case involved agents of the government of Cuba operating unlawfully in the United States and conspiring to commit espionage and murder.[269] Moreover, Ramirez's conduct in procuring and exploiting partisan media coverage of the evidence and the issues in his case distinguished *Ramirez* from the instant case. On the day Ramirez filed his lawsuit, he held a press conference on the steps of the courthouse, during which he displayed one of the items featured in his complaint, an example of a cup holder with a picture of the Cuban flag and the international "no symbol."[270] *The Miami*

grounds to question the fairness of the trial or the integrity of the verdict," but affirming the denial of a new trial because there was no reasonable likelihood that a juror's ex parte contact with the district judge impugned the integrity of the jury's verdict (citing *S. Pac. Co. v. Francois*, 411 F.2d 778, 780 (5th Cir. 1969))).

[269]R15-1660 at 7-8.

[270]*Id.* at 10.

*Herald* quoted Ramirez saying that the INS was "the most corrupt agency in the country" with a "deep hatred toward Hispanics."[271] He appeared on several radio and television shows, local rallies, and protests, and his photograph appeared on banners carried by protestors demonstrating outside of the INS building.[272] On one television show, Ramirez disclosed a document produced during a videotaped deposition taken during discovery and caused the deposition itself to be broadcast on the show, in violation of Local Rule 77.2.[273]

The defendants' argument that the government's subsequent legal position in the *Ramirez* case constituted prosecutorial misconduct that warrants a new trial is essentially a claim of judicial estoppel. Judicial estoppel bars a party from asserting a position in a legal proceeding that is inconsistent with its position in a previous, related proceeding.[274] It "is designed to prevent parties from making a mockery of justice by inconsistent pleadings."[275] Courts consider two factors in

---

[271]*Id.*

[272]*Id.* at 11.

[273]*Id.*

[274]*New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S. Ct. 1808, 1814, 149 L. Ed. 2d 968, 977 (2001).

[275]*Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002) (internal quotation marks omitted) (quoting *Am. Nat'l Bank of Jacksonville v. Fed. Deposit Ins. Corp.*, 710 F.2d 1528, 1536 (11th Cir. 1983)).

determining whether to apply the doctrine: whether the "allegedly inconsistent positions were made under oath in a prior proceeding" and whether such inconsistencies were "calculated to make a mockery of the judicial system."[276] Judicial estoppel is not applicable here because *Ramirez* was not a related proceeding, but rather an employment discrimination lawsuit. Moreover, the position that the government took in *Ramirez* occurred subsequent to–not before–its position in this case. The government filed its motion for change of venue in *Ramirez* on June 25, 2002, more than one year after the defendants were convicted.[277] Therefore, the defendants' argument that the government should have been estopped from opposing its change of venue motions in a prior proceeding is chronologically unsound, and the court did not abuse its discretion in denying the defendants' motion for new trial based on newly discovered evidence.

Nor are the defendants entitled to a new trial in the interests of justice under Rule 33(b)(2). The defendants timely filed their initial motion by the court-extended August 1, 2001, deadline[278] for filing post-trial motions, arguing that a

---

[276]*Id.* at 1285 (quotations and citations omitted).

[277]R15-1636 at Ex. 2.

[278]R126 at 14672. The district court extended the seven-day time period within which the defendants could file post-trial motions, including a Rule 33 interests of justice motion, to

new trial was warranted in the interests of justice due to the prejudice inured to them from the venue and the prosecution's misconduct at trial.[279] The district court denied the motion, citing the numerous curative measures it implemented to guarantee the defendants' right to a fair trial.[280] The record reflects that any potential for prejudice against the defendants was cured by the court's methodical pursuit of a fair trial. Basulto's comment that Hernandez's counsel was a spy for Cuba did not prejudice the defendants because it was merely a single remark during a seven-month trial by the defense's own witness, which the court struck and instructed the jury to disregard.[281] Moreover, the prosecution's closing arguments did not prejudice the defendants because the court granted the defendants' objections and specifically instructed the jury to disregard the improper statements.[282] These alleged incidents of government misconduct "were so minor that they could not possibly have affected the outcome of the trial."[283]

---

August 1, 2001, in accordance with the version of Rule 33 in effect at the time, which permitted the court to grant a motion filed "within such further time as the court sets during the 7-day period." *See* Fed. R. Crim. P. 33 advisory committee's note 2005.

[279]R12-1338, 1342, 1343, 1347.

[280]R13-1392.

[281]R81 at 8945-46, 8955.

[282]R124 at 14482, 14483, 14493.

[283]*Alvarez*, 755 F.2d at 859.

Thereafter, in November 2002, the defendants filed a renewed motion for new trial on both newly discovered evidence and interest of justice grounds.[284] The defendants based their renewed motion almost entirely on the interests of justice argument, devoting 20 of the 32 pages of the motion and 7 of the 12 supporting exhibits to that issue.[285] The defendants filed an affidavit and a survey from two new experts, an additional affidavit from Professor Moran defending his survey, and additional news articles and reports by the Human Rights Watch.[286] None of these materials were presented to the district court for consideration with the initial new trial motions. The district court declined to consider the defendants' renewed interests of justice argument and supporting materials, ruling that because "the seven-day period . . . expired more than nineteen months ago," it lacked jurisdiction to grant the motion on that basis.[287]

---

[284]R15-1635, 1638, 1644, 1647, 1650, 1651.

[285]R15-1635, R15-1636.

[286]R15-1636 at Exs. 4, 5, 7-10, 12.

[287]R15-1678 at 5. The district court relied on our precedent that states that "[t]here is no question that the seven-day time limit provided for in Rule 33 is jurisdictional." *United States v. Renick*, 273 F.3d 1009, 1019 (11th Cir. 2001) (per curiam). The court did not have the benefit of *Eberhart v. United States*, __ U.S. __, 126 S. Ct. 403, 403, 163 L. Ed. 2d 14, 17 (2005) (per curiam) (internal quotation marks omitted), which clarified that Rule 33 is "an inflexible claim-processing rule," rather than a rule "governing subject-matter jurisdiction." The Court noted that this "is an error shared among the circuits . . . . caused in large part by imprecision in [the Supreme Court's] prior cases." *Id.* at 407. Here, any error by the district court in characterizing Rule 33 new trial motions as jurisdictional was harmless.

The district court did not abuse its discretion in refusing to consider the defendants' renewed motion based on the interests of justice. A court may not consider motions for new trial based on any other argument than newly discovered evidence outside the 7-day period.[288] "This deadline is rigid. . . . [C]ourts 'may not extend the time to take any action under [Rule 33], except as stated' in Rule 33 itself."[289] Nor does a district court have the power to regard an untimely motion for new trial as a supplement to a timely motion.[290] The time for the defendants to present the entirety of their interests of justice argument was when they initially filed it in July and August of 2001, within the court-extended August 1st deadline. The defendants' renewed motion for new trial based on the interests of justice was essentially the defendants' attempt to relitigate the merits of the venue issue that the court had previously considered four times. The defendants could have commissioned Drs. Brennan and Pérez to provide affidavits in support of their position during any one of those times when the court previously considered the issue. We will not permit, nor does Rule 33 permit, the defendants to take a

---

[288] *See* Fed. R. Crim. P. 33(b)(2).

[289] *Eberhart*, 126 S. Ct. at 403 (quoting Fed. R. Crim. P. 45(b)(2)).

[290] *United States v. Hall*, 854 F.2d 1269, 1271 (11th Cir. 1988).

second–or fifth–"bite at the apple."[291]  Because the defendants' renewed interest of justice motion was filed outside the extended time period during which a court may consider new trial motions, and because the government preserved its argument that the claim was untimely,[292] the court did not abuse its discretion in declining to consider the issue.

Accordingly, because neither newly discovered evidence nor the interests of justice warrant a new trial, we affirm the court's decision to deny the defendants' motions for new trial.

### III.  CONCLUSION

Based on our thorough review of this case, we rely on the trial judge's judgment in assessing juror credibility and impartiality.  The trial judge, as a member of the community, can better evaluate whether there is a reasonable certainty that prejudice against the defendant will prevent him from obtaining a fair trial.  The judge brings to the courtroom her own perception of the depth and extent of community prejudice and pretrial publicity that might influence a juror.

Miami-Dade County is a widely diverse, multi-racial community of more

---

[291] *United States v. Geders,* 625 F.2d 31, 33 (5th Cir. 1980).

[292] *Eberhart,* 126 S. Ct. at 406 (ruling that the government forfeits its defense of untimeliness if it fails to raise the defense before the district court reaches the merits of the Rule 33 motion).

than two million people. Nothing in the trial record suggests that twelve fair and impartial jurors could not be assembled by the trial judge to try the defendants impartially and fairly. The broad discretion the law reposes in the trial judge to make the complex calibrations necessary to determine whether an impartial jury can be drawn from a cross-section of the community to ensure a fair trial was not abused in this case. Although it is conceivable that, under a certain set of facts, a court might have to change venue to ensure a fair trial, the threshold for such a change is rightfully a high one. The defendants have not satisfied it.

For the reasons given, we **AFFIRM** the district court's denial of the defendants' motions for change of venue and for new trial. Having decided these issues upon which we granted en banc review, we **REMAND** this case to the panel for consideration of the remaining issues.

BIRCH, Circuit Judge dissenting in which KRAVITCH, Circuit Judge, joins:

I respectfully dissent. I remain convinced that this case is one of those rare, exceptional cases that warrants a change of venue because of pervasive community prejudice making it impossible to empanel an unbiased jury. The defendants, as admitted agents of the Cuban government of Fidel Castro, were unable to obtain a fair and impartial trial in a community of pervasive prejudice against agents of Castro's Cuban government, whose prejudice was fueled by publicity regarding the trial and other local events. Accordingly, I would reverse their convictions and remand for a new trial.

I am convinced that, based on circuit precedent, our consideration of the denial of a motion for change of venue requires an independent review of the totality of the circumstances surrounding the trial. Therefore, in Part I, I consider in the "Background" the facts (omitted from the en banc opinion) that I conclude are essential to an understanding of the intense community pressures in this case. My review of the evidence at trial is more extensive than is typical for consideration of an appeal involving the denial of a motion for change of venue because I conclude that the *trial evidence itself* created safety concerns for the jury which mandate venue considerations. In Part II, I discuss the law and the application of the law to the facts in this case. In Part III, I present my

70

conclusion. Moreover, in this media-driven environment in which we live, characterized by the ubiquitous electronic communications devices possessed by even children (e.g., the cell phone, the I-pod, the laptop, etc.), this case presents a timely opportunity for the Supreme Court to clarify the right of an accused to an impartial jury in the high-tech age. Given the multiple resources for almost instantaneous communication and the plethora of media extant today, the considerations embraced by the Court in earlier times fail to address these developments.

## I. BACKGROUND

Included in with the charges forming the basis for the defendants-appellants' arrests and subsequent indictments were allegations that they, as agents of the Republic of Cuba, had infiltrated the United States military and reported on United States military activities, and that one of them, Gerardo Hernandez, had conspired to commit murder by supporting and implementing a plan in 1996 to shoot down United States civilian aircraft outside of Cuban and United States airspace.

The 1996 shootdown involved planes piloted by and carrying members of the Brothers to the Rescue ("BTTR"), a Cuban-exile group headquartered in Miami-Dade County. As a result of the Cuban government's military shootdown

71

of two United States-registered civilian aircraft, four members of BTTR died.[1]

Their deaths were condemned as murders by the international community.

Statements deploring Cuba's excessive use of force were issued by the United

Nations and other international organizations and legislation was passed in the

United States "strongly" condemning the shootdown as an "act of terrorism by the

Castro regime."[2]  The deceased were heralded as martyrs and their funerals were

attended by numerous people within the community.  Memorials were

subsequently erected in their honor, and streets within the Miami-Dade County

community were renamed for them.

The defendants' arrests, therefore, generated intense interest within the

community.  Shortly after the arrests, the district court entered a gag order

governing the parties and their attorneys.[3]  That order, however, did not prevent

leakage.  In the early fall of 1999, the district court reminded the parties and their

attorneys that they were to refrain from releasing information or opinions that

could interfere with a fair trial or prejudice the administration of justice.[4]  The

---

[1] United States v. Hernandez, 106 F. Supp. 2d 1317, 1318 (S.D. Fla. 2000).

[2] Alejandre v. Republic of Cuba, 996 F. Supp. 1239, 1247 (S.D. Fla. 1997); 22 U.S.C. §6046(1).

[3] R7-978 at 3; R21 at 117.

[4] R18 at 14.

district judge stated that she was "increasingly concerned" that various persons connected with the case were not following her order based on the "parade of articles appearing in the media about this case."[5] In particular, she commented that an article about defendant Medina's pending motion to incur expenses to poll the community "was the lead story in the local section on Saturday in the Miami Herald."[6] She warned all counsel and agents associated with the case that appropriate action would be taken and that the U.S. Attorney's Office would be held responsible.[7] She directed that "[t]his case . . . not . . . get advertised anywhere in the media for any reason whatsoever."[8] The motion to incur expenses was filed in August 1999 and was subsequently granted by the district court.[9]

## A. Motion for Change of Venue

As the en banc opinion notes, Campa, Gonzalez, Guerrero, and Medina moved for a change of venue in January 2000, arguing that they were unable to obtain an impartial trial in Miami as a result of pervasive prejudice against anyone

---

[5] Id.

[6] Id. at 15.

[7] Id. at 14-15.

[8] Id. at 17.

[9] R1-280 at 2-3; R2-303; R18 at 11-12.

associated with Castro's Cuban government.[10]  The motions for change of venue were based on both the pretrial publicity and on the "virulent anti-Castro sentiment" which had existed in Miami as "a dominant value . . . for four decades."[11]  The motions were supported by news articles and Moran's poll to substantiate "an atmosphere of great hostility towards any person associated with the Castro regime" and "the extent and fervor of the local sentiment against the Castro government and its suspected allies."[12]

The evidence submitted in support of the motions for change of venue was massive.  At that time, there were more than 700,000 Cuban-Americans living in Miami.[13]  Of those Cuban-Americans, 500,000 remembered leaving their

---

[10]  R2-317 (Guerrero), 321 (Medina), 324 (Gonzalez), 329 (Campa); R3-397 (Campa). Medina requested a change of venue "in light of evidence of pervasive community prejudice against the accused" as documented by Professor Gary Moran's survey which showed "public sentiment against persons alleged to be agents of Fidel Castro's Communist government in Cuba."  R2-321 at 1-2.  Moran concluded that, while there had been "several bursts of newspaper articles . . . and other media attention" surrounding the Cuban spies' arrests, the basis for the motion was the "[v]irulent anti-Castro sentiment" in the community.  Id. at 3.

Although Campa, Gonzalez, Guerrero, and Medina had originally argued that the case should be moved to another judicial district, during oral argument on the motions, they agreed that they would be satisfied with a transfer of the case within the district from the Miami division to the Fort Lauderdale division.  R5-586 at 2 n.1.

[11]  R2-321 at 3; R2-316 at 2; R2-317 at 2; R2-324 at 1; R2-329 at 1; R2-334 (containing news articles which detail the history of anti-Castro sentiment in Miami); R3-397 at 1; R3-453 at 1-2; R3-455 at 2; R3-461 at 2-3.

[12]  R2-329 at 1, 3; R2-334; R3-397; R3-455.

[13]  R15-1636, Ex. 9.

homeland, 10,000 had a relative murdered in Cuba, 50,000 had a relative tortured in Cuba, and thousands were former political prisoners.[14] These Cuban-Americans considered Cuban-related matters "'hot-button issues.'"[15]

Professor Moran's survey results showed that 69 percent of all respondents and 74 percent of Hispanic respondents were prejudiced against persons charged with engaging in the activities named in the indictment.[16] A significant number, 57 percent of the Hispanic respondents and 39.6 percent of all respondents, indicated that, "[b]ecause of [their] feelings and opinions about Castro's government," they "would find it difficult to be a fair and impartial juror in a trial of alleged Cuban spies."[17] Over one-third of the respondents, 35.6 percent, said that they would be worried about criticism by the community if they served on a jury that reached a not-guilty verdict in a Cuban spy case.[18] The respondents who indicated an inability to be fair and impartial jurors were also asked whether there were any circumstances that would change their opinion.[19] Of those respondents,

---

[14] Id.

[15] R15-1636, Exh. 9.

[16] R2-321, Ex. A at 10.

[17] Id. at Ex. A at 12; see id. at Ex. E at 3.

[18] Id. at Ex. A at 11-12.

[19] Id. at Ex. A at 13; id. at Ex. E at 3.

75

91.4 percent of the Hispanics and 84.1 percent of the others answered "no."[20]

The articles submitted by the defendants included articles that related

directly to the charged crimes and to the defendants and their codefendants.[21]

_____

[20] Id. at Ex. A at 13.

[21] The following articles specifically addressing the conspiracy and the indicted defendants were attached as exhibits in support of the motions for change of venue:  George Gedda, Federal officials say 10 arrested, accused of spying for Cuba, MIAMI HERALD,  Sept. 14, 1998, R2-334, Ex.;   Manny Garcia, Cynthia Corzo, Ivonne Perez, Spies among us: Suspects attempted to blend in, Miami, MIAMI HERALD, Sept. 15, 1998, at A1, R2-334; David Lyons, Carol Rosenberg, Spies among us:  U.S. cracks alleged Cuban ring, arrests 10,  MIAMI HERALD, Sept. 15, 1998, at A1, R2-329, Ex. A; R2-334, Ex.; Spies among us, MIAMI HERALD, Sept. 15, 1998, at 14A, R2-329, Ex. F; Fabiola Santiago, Big news saddens, angers exile community, MIAMI HERALD, Sept. 15, 1998, R2-334, Exh.; Juan O. Tamayo, Arrest of spy suspects may be switch in tactics, MIAMI HERALD, Sept. 15, 1998, R2-334, Exh.; Javier Lyonnet, Olance Nogueras, Cae red de espionaje de Cuba/FBI viro´ al revés casa de supuesto cabecilla and Pablo Alfons, Rui Ferreira, Cae red de espionaje de Cuba/Arrestan a 10 en Miami, NUEVO HERALD, Sept. 15, 1998, at A1, R2-329, Exh. B; La Habana Contra El Pentagono("Havana versus the Pentagon")/Estructura de la Red de Espionaje, NUEVO HERALD, Sept. 15, 1998, R2-329, Exh. C; Arrest of alleged Cuban spies demands vigorous prosecution, SUN-SENTINEL, Sept. 16, 1998, at 30A, R2-329, Exh. G; Juan O. Tamayo, Miscues blamed on military's takeover of Cuban spy agency, MIAMI HERALD, Sept. 17, 1998, at 13A, R2-334, Exh.; David Kidwell, Motion could delay trials of alleged 10 Cuban spies, MIAMI HERALD, Oct. 6, 1998, at B1, R2-334, Exh.; David Lyons, Cuban couple pleads guilty in spying case,  MIAMI HERALD, Oct. 8, 1998, at A1, R2-334, Exh.; David Kidwell, Three more accused spies agree to plead guilty, MIAMI HERALD, Oct. 9, 1998, at 4B, R2-329, Exh. H; R2-334, Exh.; Carol Rosenburg, Couple admits role in Cuban spy ring, MIAMI HERALD,  Oct. 22, 1998, at 5B, R2-329, Exh. H; Juan O. Tamayo, U.S.-Cuba spy agency contacts began a decade ago, MIAMI HERALD, Oct. 31, 1998, R2-334, Exh.; David Kidwell, U.S. tries to tie espionage case to planes' downing, MIAMI HERALD, Nov. 13, 1998, at A1, R2-334, Exh.; Carol Rosenberg,  Identities of 3 alleged spies still unknown, Nov. 14, 1998, at B1, R2-334, Exh.; Juan O. Tamayo, Spies Among Us/Castro Agents Keep Eye on Exiles, MIAMI HERALD, Apr. 11, 1999, R2-329, Exh. D; R2-334, Exh.; Carol Rosenberg, Shadowing of Cubans a classic spy tale, MIAMI HERALD, Apr. 16, 1999, at A1, R2-329, Exh. E; R2-334, Exh.; Cuban spy indictment/Charges filed in downing of exile fliers/The Brothers to the Rescue Shootdown:  David Lyons, Castro agent in Miami cited by U.S. grand jury, Juan O. Tamayo, Brothers to the Rescue Shootdown/Top spy planned Brothers ambush, and Elaine de Valle, Relatives: Charges fall short, MIAMI HERALD, May 8, 1999, R2-334, Exh.; Confessed Cuban spy receives seven years, MIAMI HERALD, Jan. 29, 2000, at B1, R2-355 at C-2; Contrite Cuban spy couple sentenced, MIAMI HERALD, Feb. 3, 2000, at B5, R3-355 at D-2; Miami Spy-Hunting,

76

Other articles documented community tensions and protests related to general anti-

Castro sentiment, the conditions in Cuba, and other ongoing legal cases in which

Cuban-American issues were involved, including the Elian Gonzalez matter.[22]

_____

MIAMI HERALD, Feb. 19, 2000, at 21A, R3-397, Exh. G-1; Carol Rosenberg, Confessed Cuban spies sentenced to seven years, MIAMI HERALD, Feb. 24, 2000, at 1B, R3-397, Exh. I-1; Terrorism must not win in Brothers to the Rescue shoot-down, MIAMI HERALD, Feb. 24, 2000, at 8B, R3-397, Exh. J-1 ("More than compensation, the families want the moral sting of a U.S. criminal prosecution in federal court. So far there is only one indictment: Gerardo Hernandez, alleged Cuban spy-ring leader, charged last year with conspiracy to murder in connection to the shoot down."); Brothers Pilots Remembered (photo), MIAMI HERALD, Feb. 25, 2000, at B1, R3-397, Exh. K-1; Marika Lynch, Shot-down Brothers remembered, MIAMI HERALD, Feb. 25, 2000, at 2B, R3-397, Exh. L-1.

[22] R3-397, Exs.; R4-483, Exs.; R4-498, Exs.

During the same period of time in which the motions for change of venue were pending, and ultimately the trial was conducted, there was a substantial amount of publicity regarding other matters of interest in the Cuban community including the conditions in Cuba and high profile legal events occurring in Miami: the Elian Gonzalez matter; the arrest of an United States immigration agent, Mariano Faget, who was accused of spying for Cuba; and a city-county ban on doing business with Cuba.

As to the general anti-Castro sentiments and the conditions in Cuba: Juan O. Tamayo, Former U.S. Pows Detail Torture by Cubans in Vietnam/Savage beatings bent captives to will of man dubbed 'Fidel', MIAMI HERALD, Aug. 22, 1999, at A1, R2-329, Ex. I; Juan O. Tamayo, Cuba toughens crackdown/'Biggest wave of repression so far this year', MIAMI HERALD, Nov. 11, 1999, at A1, R2-329, Ex. K; Juan O. Tamayo, Witnesses link Castro, drugs, MIAMI HERALD, Jan. 4, 2000, at B3, R2-329, Ex. J; Marika Lynch, Castro-challenging pilot is offered parade, honors, Jan. 4, 2000, at B1, R2-329, Ex. M; Jim Morin, Cuba: I cannot speak my mind (cartoon), MIAMI HERALD, Jan. 20, 2000, R2-329, Ex. P.

As to Elian Gonzalez: Juan O. Tamayo, Castro Ultimatum/Return boy in 72 hours or migration talks at risk, MIAMI HERALD, Dec. 6, 1999, at 1A, R2-329, Ex. N; Sara Olkon, Gail Epstein Nieves, Martin Merzer, The Saga of Elian Gonzalez/Protest and Passion Spread to the Streets/Sit-ins block intersections and disrupt Dade traffic and Politicians, lawyers work to halt 6-year-old's return, MIAMI HERALD, Jan. 7, 2000, 1A, I see no basis for reversing decision, Reno says and Sara Olkon, Anabelle de Gale, Marika Lynch, Pained Cuban exiles disagree on what's best for Elian, MIAMI HERALD, Jan. 7, 2000, at 17A, U.S. Preparations for boy's return start slowly, The Miami Herald, Jan. 7, 2000, at 18A, R2-329, Ex. O; Peaceful Rally (photo), MIAMI

77

HERALD, Jan. 9, 2000, at 1A, R2-329, Ex. N;  Jay Weaver, 3rd judge gets high profile in Elian case, MIAMI HERALD, Feb. 23, 2000, at 1B, R3-397, Ex. A-1; Sandra  Marquez Garcia, Mary 'appears' near Elian, MIAMI HERALD, Mar. 26, 2000, at 1B, R4-483, Ex. E-3; Alfonso Chardy, Authorities keep watch on exile groups, MIAMI HERALD, Mar. 29, 2000, at 10A, R4-483, Ex. C-3; Vigilant protestors,  MIAMI HERALD, Mar. 29, 2000, at 10A, R4-483, Ex. I-3; Andres Viglucci, Jay Weaver, and Frank Davies, Dad gets visa, but no guarantees for Elian's transfer, MIAMI HERALD, Apr. 5, 2000, at 1A, R4-483, Ex. D-3; Elaine de Valle, Media watch events closely–and get watched in return/Hot words on radio scrutinized, and Terry Jackson, Media watch events closely–and get watched in return/TV talk, news shows flocking to South Florida, MIAMI HERALD, Apr. 5, 2000 at 15A, R4-483, Ex. B-3; Karen Branch, Crowds target Reno's home, MIAMI HERALD, Apr. 6, 2000, at 2B, R4-483, Ex. A-3; The saga of Elian/Reno wants Elian today/Boy must be at airport by 2 P.M./Defiant family refusing to comply:  Andres Viglucci, Jay Weaver, and Ana Acle, Great-uncle challenges U.S. to take boy 'by force', and Carol Rosenberg, The Attorney general followed 'instinct' as final mediator, MIAMI HERALD, Apr.13, 2000, at 1A, R4-483, Ex. F-3; The saga of Elian/Family defies order/Crowd swells at Little Havana home/Judge dismisses family's custody case/Panel will weigh request for a stay/U.S. takes no action to remove Elian: Ana Acle, In a show of solidarity, VIPs flock to visit boy, and Andres Viglucci and Jay Weaver, Reno: U.S. will explore all peaceful solutions, MIAMI HERALD, Apr. 14, 2000, at 1A, R4-483, Ex. G-3; Saga of Elian/Standoff over custody/A show of solidarity(photo), MIAMI HERALD, Apr, 14, 2000, at 20A, R4-483, Ex. H-3; Karl Ross, W. Dade home of attorney general on alert, and Police say an anonymous caller phoned in bomb threat April 13, MIAMI HERALD, Apr. 16, 2000, R4-498, Ex. A-4; Raid's Prelude: How talks failed/Missed signals helped doom deal and Sara Olkon, Diana Marrero, and Elaine de Valle, Thousands protest seizure/Separate rally backs Reno's actions, MIAMI HERALD, Apr. 30, 2000, at 1A, R4-498, Exh. C-4;  Carol Rosenberg, INS agent targeted by death threats, MIAMI HERALD, May 6, 2000, R4-498, Exh. B-4; and In memory of mothers who died at sea (photo), MIAMI HERALD, R4-498, Exh. D-4.

As to Mariano Faget: Elaine de Valle, Fabiola Santiago, and Marika Lynch, FBI: Official in INS spied for Cuba, MIAMI HERALD, Feb. 18, 2000, at A1, R3-397 at C-1; Amy Driscoll, Juan Tamayo, Spy bait taken instantly/Alleged Cuban agent phoned contact after receiving false FBI information, Fabiola Santiago, Aloof suspect with high clearance was ideally positioned to do harm,  and Tracking Faget (photos), MIAMI HERALD, Feb. 19, 2000, at A1, R3-397 at B-1; Don Bohning, Faget's father was a brutal Batista official, MIAMI HERALD, Feb. 19, 2000, at 21A, R3-397, Exh. G-1; Frank Davies, Cuba, U.S. still fight Cold War, MIAMI HERALD, Feb. 19, 2000, at 21A, R3-397, Exh. H-1;  Juan O. Tamayo, Cuban diplomat expelled over spy link, MIAMI HERALD, Feb. 20, 2000, at A1, R3-397, at D-1; Liz Balmaseda, Spy case boosts worst suspicions, MIAMI HERALD, Feb. 21, 2000, at B1, R3-397, at F-1; Juan O. Tamayo, Cuban diplomat linked to Elian, INS spy case, MIAMI HERALD, Feb. 22, 2000, at A1, R3-397, at E-1; Juan O. Tamayo, More exiles maneuvering for business with Cuba, MIAMI HERALD, Mar. 5, 2000, at A-1, R3-455 at A-2; Ana Radelat and Jan O. Tamayo, FBI agents expel defiant Cuban envoy, MIAMI HERALD, at A-1, R3-455 at B-2.

One of the articles, which addressed a bomb threat against the Attorney General of

the United States following a collapse of talks in the Elian Gonzalez case, recited a

history of anti-Castro exile group violence in the Miami-Dade community:

> Scores of bomb threats and actual bombings have been
> attributed to anti-Castro exile groups dating back to the 1974
> bombings of a Spanish-language publication, Replica.  Two years
> later, radio journalist Emilio Millan's legs were blown off in a car
> bomb after he spoke out against exile violence.
> In the early 1980s, the Mexican and Venezuelan consular
> offices were bombed in retaliation for their government's establishing
> relations with Cuba.
> Since then, numerous small businesses–those promoting commerce,
> travel, or humanitarian aid to Cuba–have been targeted by bombers.[23]

The government responded to the change of venue motions that the Miami-

Dade Hispanic population was a "heterogeneous," "highly diverse, even

contentious" "group" immune from the influences which would preclude a fair

trial.[24]  Following oral arguments on 26 June 2000, the district court denied the

---

As to the business ban:  Marika Lynch, Fernando Almanzar, <u>Protest, taping set to follow Van Van show</u>, MIAMI HERALD, Sept. 28, 1999, at 3B, and Tyler Bridges, Andres Viglucci, <u>Miami may bar Van Van next time/County's Penelas also opposed</u>, MIAMI HERALD, Oct. 13, 1999, at B1, R2-329, Exh. L;  Don Finefrock, <u>Ban on business with Cuba tightened</u>, MIAMI HERALD, Feb. 25, 2000, at 2A, R3-397, Exh. M-1; Jordan Levin, <u>Miami-Dade threatens to cancel film fest grant/Cuban movie collides with county law</u>, MIAMI HERALD, Feb. 25, 2000, at 1A, R3-397, Exh. N-1; Jordan Levin, <u>Groups 'warned' on Cuba resolution</u>, MIAMI HERALD, May 15, 2000, at  1B, R4-498, Exh. E-4; <u>Decenas De exiliados se congregaron ante la Corte Federal para reclamar el derecho de Elian Gonzalez a permanecer en EU</u>, R3-455, Exh. E-2.

[23]  R4-498, Ex. A-4.

[24]  R3-443 at 11.

79

motion without prejudice, finding that the defendants had failed to demonstrate that a change of venue was necessary to provide them with a fair trial by an impartial jury.[25] The district court "construed" the motions "as directed primarily toward the issue of 'pervasive community prejudice'" and focused its analysis on "the third inquiry set forth in" Ross v. Hopper, 716 F.2d 1528, 1541 (11th Cir. 1983).[26] This third inquiry was defined as "sufficient evidence that the pretrial publicity has been 'so inflammatory and prejudicial and so pervasive or saturating the community as to render virtually impossible a fair trial by an impartial jury, thus raising a presumption of prejudice.'"[27] The court "decline[d] to afford the survey and Professor Moran's conclusions the weight attributed by Defendants" finding, inter alia, that the "size of the statistical sample . . . [wa]s too small to be

---

[25] Hernandez, 106 F. Supp. 2d at 1317-18; R5-586.

[26] Id. at 1321 n.2.

[27] Id. at 1323-24. By limiting its analysis to the third inquiry of Ross, the district court necessarily limited its review of the defendants' evidence to consideration of whether that evidence demonstrated the prejudicial effect of pretrial publicity. See Ross, 716 F.2d at 1540. Further, as the en banc opinion states, the district court rejected the defendants' community survey and thus focused its analysis solely on the submitted articles. Contrary to the en banc opinion's statement in n. 219 that the district court made a specific finding as to prejudice in the community, this finding was limited to its prior finding that the defendants' evidence demonstrated "that the pretrial publicity has not been 'so inflammatory and pervasive as to raise a presumption of prejudice' among the potential jury venire in the case." Hernandez, 106 F. Supp. 2d at 1322, 1324.

representative of the population of potential jurors in Miami-Dade County."[28]

In September 2000, Campa moved for reconsideration of the denial of the motion for change of venue. In support of the reconsideration motion, he submitted news articles containing information that he provided the court both during an ex parte sidebar within the change of venue motion hearing and in his motion for leave to file his motions for foreign witness depositions ex parte.[29] He explained in the reconsideration motion that the information had been previously provided to the court ex parte because it disclosed the defendants' theory of defense and that he sought the foreign witnesses to support that theory.[30] He argued that the news articles discussing "the defendants' tacit admission that they were keeping an eye on several extremist anti-Castro groups on behalf of the Cuban government, and that Cuban citizens and officials [we]re prepared to testify on behalf of the defendants" had aggravated the prejudice in the Miami community.[31] He noted that the articles characterized the defendants as Cuban

---

[28] Id.

[29] R5-656 at 2-3.

[30] Id. at 2.

[31] Id. at 3 (internal punctuation omitted).

agents who would call Cuban officials and citizens to testify on their behalf.[32]  The

district court denied reconsideration and invited the defendants to renew their

motion after voir dire.[33]

B.  Voir Dire

The trial began with jury selection on 27 November 2000.[34]  In phase one,

168 jurors were screened for problems such as language and hardship through a

written questionnaire and oral voir dire questions.[35]  In phase two, the 82

remaining prospective jurors were individually questioned regarding media

exposure, knowledge and opinions of the case, the Castro government, the United

States policy toward Cuba, the Elian Gonzalez case, the Cuban exile community

and its reaction to the case, including a possible acquittal.[36]

---

[32]  Id.  The following articles were included as exhibits:  Rui Ferreira, Cuba helps defense at spy trial, MIAMI HERALD,  Aug. 18, 2000, at 1B, R5-656, Ex. A; Rui Ferreira, Funcionarios cubanos irán al juicio de los espias, NUEVO HERALD, Aug. 18, 2000, at 17A, R5-656, Exh. B; Cuba colaborará en juicio por espionaje, NUEVO DIARIO, Aug. 19, 2000, at 61, R5-656, Exh. C; Rui Ferreira, Un misterioso coronel cubano se suma al caso de los espias, NUEVO HERALD, Aug. 21, 2000, at 21A, R5-656, Exh. D; To the point/Mr. President, define "handshake", MIAMI HERALD, Sept. 11, 2000, at 6B, R5-656, Exh. F; and Accused spy seeks release of U.S. documents, MIAMI HERALD, Sept. 12, 2000, at 33, R5-656, Exh. E.

[33]  R6-723 at 2-3.

[34]  R6-765.

[35]  R6-766; R22.

[36]  The district court disqualified 79 of the 168 venire persons for cause, 32 (19%) in Phase 1 and 22 (27%) in Phase 2 for Cuba-related animus.

The district court's concern for the media attention became an issue on the first day of voir dire. After learning that the jurors were exposed to a press conference held by the victims' families on the courthouse steps during the lunch break and that some of the jurors were approached by members of the press, the district court addressed isolating the jurors.[37] Acknowledging that there was a "tremendous amount of media attention" in the case, the district judge instituted a number of protections for the jury including instructing the government to speak to the victims' families about their conduct, extending the gag order to cover the witnesses and jurors, instructing the marshals to accompany the jurors as they left the building, and sealing the voir dire questions.[38]

Some venire members were clearly biased against Castro and the Cuban government and were excused for cause.[39]

<hr>

[37] R22 at 111-16; R62 at 6575-76.

[38] R7-978 at 2-3, 7; R21 at 111-113, 117-19; R22 at 115, 119; R64 at 6459-60.

[39] See R25 at 782, 789 (potential juror stated that she would not believe any witness who admitted that he had been a Cuban spy); R26 at 1068-70 (potential juror admitted that he "would feel a little bit intimidated and maybe a little fearful for my own safety if I didn't come back with a verdict that was in agreement with what the Cuban community feels, how they think the verdict should be," and that, "based on my own contact with other Cubans and how they feel about issues dealing with Cuba–anything dealing with communism they are against," he would suspect that "they would have a strong opinion" on the trial. He explained that he "probably would have a great deal of difficulty dealing with listening to the testimony. . . . would probably be a nervous wreck, . . . and would have some trouble dealing with the case." He said that he "would be a little bit nervous and have some fear, actually fear for my own safety if I didn't come back with a verdict that was in agreement with the Cuban community at large."); R27 at 1277 (potential juror

83

Other venire members indicated negative beliefs regarding Castro or the Cuban government but believed that they could set those beliefs aside to serve on the jury.[40]  Three of these jurors ended up seated on the jury, and one served as

expressed concern that, "no matter what the decision in this case, it is going to have a profound effect on lives both here and in Cuba."  He believed that the Cuban government was "a repressive regime that needs to be overturned," was "very committed to the security of the United States," and "would certainly have some doubt about how much control [a member of the Cuban military] would have over what they would say [on the witness stand] without some tremendous concern for their own welfare."); R26 at 1057, 1059, 1073 (a potential juror who was a banker and senior vice president in charge of housing loans was "concern[ed] how . . . public opinion might affect [his] ability to do his job" because he dealt with a lot of developers in the Hispanic community and knew that the case was "high profile enough that there may be strong opinions" which could "affect his ability to generate loans."); R27 at 1166, 1168 (potential juror said that he did not like the Cuban government and asked "how could you believe" the testimony of an individual connected with the current Cuban government); R28 at 1452-53 (potential juror believed that "Fidel Castro is a dictator" and that there were "things going on in Cuba that the people are not happy about."); R26 at 1001-02 (potential juror thought that Castro had "messed up" Cuba which was "a very bad government . . . perhaps one of the worst governments that exist . . . on the planet.")

[40]  See R25 at 880 (potential juror said she held a "[v]ery strong" opinion and did not believe in the Cuban system of government but did not feel that it would affect her ability to render a verdict); R25 at 829-31, 51-52 (potential juror thought she could be impartial, but admitted that "it would be difficult" and that she did not know if she "could be fair."  She said that the case was discussed "every time my [Cuban born] parents have visitors over" and that she knew she would be "a little biased" in favor of the United States as she did not agree with "communism."); R27 at 1240-47 (potential juror, who was born in Cuba and immigrated to the United States with her family in the late 1950s-early 1960s, had three relatives who were involved in the Bay of Pigs invasion and her husband had participated in the 1980 Mariel boat lift to rescue his sister and her family from Cuba.  Although she stated that she would be impartial, she said that she saw "Castro as a dictator."); R25 at 790-96 (potential juror, a Cuban immigrant, said that she did "not approve of the regime . . . in Cuba" and was "against communism" but believed she could serve impartially.  She remembered the news from the television and the Miami Herald about the planes being shot down); R27 at 1227-32 (potential juror said that, although her father left Cuba because of communism and she believed that the Cuban government was "oppressive," she believed that she would not be prejudiced); R27 at 1148-50 (potential juror who was born in Cuba and immigrated to the United States with her family stated that she was "always for the U.S." and "against the Republic of Cuba," did not like Cuba being a communist country, and had relatives living in Cuba.  She had a problem with the case because it

84

involved "espionage against the U.S." but indicated that she could set aside her feelings to serve on the jury); R26 at 1011-13, 1018-19 (potential juror commented that he had "no prejudices" but "live[d] in a neighborhood where there [we]re a lot of Cubans" and was "acquainted with people that come from Cuba. That is universal in Dade County." When asked whether he would be concerned about community sentiment if he were chosen as a juror, he "answer[ed] . . . with some care. . . . [i]f the case were to get a lot of publicity, it could become quite volatile and . . . people in the community would probably have things to say about it." He stated that "it would be difficult given the community in which we live" "to avoid hearing somebody express an opinion" on the case and to follow a court's instruction to not read, listen to, or otherwise expose himself to information about the case. His opinion about the Cuban government was "not favorable" as it was "not a democracy" and was "guilty of assorted [human rights] crimes."); R26 at 1021-28, 1030, 10323223, (potential juror initially said that he did not "think he would have any sort of prejudice[]" against defendants who were agents of the Cuban government but could not say for certain because of "[t]he environment that we are in. This being Miami. There is so much talk about Cuba here. So many strong opinions either way." He later, however, admitted to having biases against the Cuban government, which he believed was "anti-American" and "tyrannical," and to having "an obvious mistrust . . . of those affiliated with the [Cuban] government." He also indicated that he would be concerned about returning a not guilty verdict because "a lot of the people [in Miami] are so right wing fascist," because he would face "personal criticism" and media coverage, and because he had concerns for what might happen after a verdict was returned. He believed the case to be "a high profile case" and that he had been videotaped by the media when leaving the courthouse.); R27 at 1139-48 (potential juror who was born in Cuba and immigrated to the United States with his parents initially stated that he did not think he "could make a fair judgment" in the case and would be prejudiced because he had "a lot of family ties in Cuba" including uncles, aunts, and cousins but later answered that he could set aside his concerns if selected for the jury. He was troubled about returning a verdict in the case based on his concern for something happening to his "family . . . in Cuba" and the notoriety of the case in Miami. He also said that he had "heard a lot about the case . . . on the news [and from] people talking about" it); R28 at 1424-25, 1433 (potential juror believed that Castro was "a very bad person" and, when asked whether her opinion regarding the Cuban government would affect her ability to fairly weigh the evidence, answered "I don't think so. . . . I don't know. I have lived in South Florida for 36 years and I have seen many changes." She had known one of the passengers in one of the BTTR planes on the day of the shoot-down and who was named as a government witness, for about eight years. She also knew that the witness was "very involved with the Brothers to the Rescue and very strongly keeping the Cuban community together in Miami."); R25 at 818-22 (potential juror did not think that it would affect his ability to be impartial but he "was not happy" with United States-Cuban relations following the Mariel boat lift. He did not like the freedom that Cubans had to immigrate to the United States because immigrants from other countries were treated differently and "sometimes [he felt like] a stranger in [his] own country" when he needed to ask someone to speak English instead of Spanish); R27 at 1118-28, 1175-77 (potential juror had "many close Cuban friends," including her husband's business partner who was a member of a group that rescued Cubans fleeing the island. She

85

the foreperson.[41]  The district court denied the defendants' request to excuse one potential juror, who admitted that she knew the daughter of one of the downed pilots, had visited the pilot's home, and had attended his funeral.[42]

Finally, other venire members espoused indifference toward Castro or the Cuban government.[43]

believed that she could be impartial but had concerns about returning a verdict in Miami "because of the Cuban population here."  She "was a little distressed with the way that the [Cuban] exile community handled" the Elian Gonzalez matter because she did not "like the crowd mentality, the mob mentality that interferes with what I feel is a working system."  She strongly believed that the Cuban government was an oppressive dictatorship.  She remembered news reports regarding "the planes being shot down" and several men dying, and that it was a "very bad situation" and frightening because of the possibility of military action.  Leilani Triana testified that, although her parents were from Cuba and her grandfather had been politically involved in Cuba before Castro, she could be impartial.

[41]  See R24 at 555, 561-62, 571, 590; R25 at 741-49.  David Buker, who served as jury foreperson, stated that he believed that "Castro is a communist dictator and I am opposed to communism so I would like to see him gone and a democracy established in Cuba."  Although the government notes that Campa's attorney commented that Buker was "uninvolved or personally disconnected from the experience [of a Cuban] and that his "general philosophical problem with communism" was "perfectly okay," Campa's attorney's comment was made in the context of his argument concerning striking for cause another juror whose responses were "rooted in personal experience."  R25 at 851.

Both Sonia Portalatin, who  had a "strong" opinion about the Cuban government because she was "against communism,"  R24 at 619; R25 at 858-65, and Eugene Yagle, who admitted having "a strong opinion" about the Cuban government as he could not "reconcile [him]self to that form of Government," R22 at 144, 165-67; R27 at 1294-1300; R28 at 1517-20; R29 at 1553-57, 1601-02, 1638, were seated on the jury.

[42]  R24 at 519-22, 534-36.  The potential juror was the principal of the predominantly (90 percent) Cuban high school attended by the daughter of one of the killed BTTR pilots.  She visited the pilot's home and attended his funeral.  Despite her relationship with the pilot's daughter, she thought she "could be fair" although "it would be a little difficult."

[43]  See R25 at 841-43, 846 (potential juror had traveled to Cuba with his family "to take goods" and medicines to friends and had friends who frequently traveled to Cuba; he knew of no

86

Some of the potential jurors who had personal contact with the victims, their family members, BTTR, government witnesses, or the parties were not questioned during Phase II or were excused for cause.[44] Following voir dire, Medina's attorney complimented the district court on the conduct of voir dire but indicated his concerns that there were three women seated on the jury who exemplified Professor Moran's opinion that certain community members who were subjected to community pressures were unable to admit their underlying prejudices.[45]

From the beginning of voir dire until the completion of the trial, the

reasons why he should not serve on the jury. He remembered hearing or reading "years back" "something about Brothers to the Rescue" and someone in the group who was a spy for the Cuban government); R27 at 1300-08 (potential juror who had family in Cuba thought he could be fair, but was unable to say whether he would be able to believe a witness who was a member of the communist party in Cuba); R27 at 1134-39 (potential juror whose parents and grandparents had immigrated from Cuba and who had distant relatives who remained in Cuba but he had no opinions regarding the Cuban government, the trial, or the publicity surrounding it); R26 at 990-06 (potential juror felt sympathy for the people living in Cuba but believed that she would be impartial as a juror. She knew from the media that "airplanes were shot down in Cuba a couple of years ago" and that "some families . . . gathered to remember the anniversary of the incident" a few weeks before voir dire); R26 at 938, 945 (potential juror had concerns about community reaction to a verdict because she did not "want rioting and stuff to happen like what happened with the Elian case. I thought that got out of hand.").

[44] See R21 at 139; R23 at 251, 254; R24 at 373, 385-86, 458, 508-10 (three potential jurors knew government witness Jose Basulto, another knew a widow of one of the killed BTTR pilots, and a third knew the daughter of one of the BTTR victims); R25 at 776-70, 809-12; R26 at 937-41 (potential juror who was a former national bank examiner had assisted the United States Attorney's office in Miami for three years during a grand jury investigation); R25 at 655, 690, 709 (potential juror knew knew many of the named witnesses, and had helped raise money for BTTR while working for one of the local Cuban radio stations).

[45] R27 at 1373-76.

prospective and actual jurors were admonished not to discuss the case with anyone

and to have no contact with media accounts or anything else related to the case.[46]

The jurors were also instructed about the presumption of innocence.[47]  The district

court limited the sketching of witnesses for their protection.[48]  It permitted,

however, the media "access to all the evidence admitted into the trial record."[49]

C.  The Evidence at Trial

As the en banc opinion states, the defendants were members of a Cuban

government intelligence operation that maintained a spy operation in South

Florida.  Campa, Hernandez, and Medina falsely identified themselves through

elaborate "legends," or biographies, and back-up or "reserve" identities when they

dealt with United States border and law enforcement personnel and when they

obtained driver licenses, passports, and other identification.[50]  Some of their

---

[46]  R21 at 44-45; R22 at 119; R116 at 13492-93.

[47]  R21 at 26.

[48]  R9-1126.

[49]  Hernandez, 124 F. Supp. 2d 698, 704 (S.D. Fla. 2000); R7-808.

[50]  R33 at 2145; R34 at 2321-40; R44 at 3724-26; R49 at 4677-78; R66 at 6833-35; R69 at 6981-7016 Govt. Exs. 4; 5-1; 5-2; 5-3; 5-4; 5-6; 6; 7; 9; 8-1; 8-3; 8-4; 11; 12-3; 12-4; 12-5; 12-8; DAV 110 at 2, 118 at 7-14; DG 105 at 2-16; DG 125; DG 126 at 9-10; DG 135 at 3-11; DG 136; SF 14; SF 15; SG 34; SG 53.  Under their false identities, Campa was also known as Fernando Gonzalez Llort, Oscar, or Vicky, R101 at 11714; Gonzalez was known as Agent Castor; Guerrero was known as Lorient, Govt. Exs. DAV 102 at 1; DAV 129 at 2; Hernandez was known as Girardo, Giro, or Manuel; and Medina was known as Allan or Ramon Labanino; R101 at 11721-23.

assigned duties included infiltrating, monitoring, and disrupting the work of

certain militant Cuban exiles in South Florida, reporting on anti-Castro

organizations in Miami-Dade County, and infiltrating United States military and

government agencies and reporting on operations at certain United States military

installations.[51]

The Cuban exile groups of concern to the Cuban government included

Alpha 66,[52] Brigade 2506, BTTR , Independent and Democratic Cuba ("CID"),

_____

[51] R45 at 3870-71; Govt. Exs. DAV 109 at 6-7; DG 101 at 2; DG 102 at 30; DG 107 at 12-20, 58-67; DG 108 at 2-3; DG 117; DG 129; DG 137 at 2; HF 103. The Cuban government maintains the following intelligence operations: the Directorate of Military Intelligence ("DIM") under the Ministry of Revolutionary Armed Forces, and the Directorate of Intelligence ("DI") and the Directorate of Counterintelligence ("DCI") under the Ministry of the Interior. R44 at 3700-05, 3707. The DI collects intelligence outside of Cuba, focusing primarily on the United States; the DCI is responsible for intelligence regarding counter-revolutionary activities inside of Cuba. R44 at 3704, 3707. The DI is organized into many operational components, including M-I which handles non-military United States government agency intelligence, M-III which handles the collecting, correlating, and reporting of gathered information, M-V which handles the operation and support of "illegal" intelligence officers ("IO"s) who enter the United States illegally with a false identity and identification, M-XIX which handles counter-revolutionary individuals and organizations outside of Cuba. R44 at 3708-11, 3713; R46 at 3957.

[52] Orlando Suarez Pineiro, a Cuban-born permanent resident of the United States, served as a captain in Alpha 66 for about six years. R90 at 10373-74. On 20 May 1993, he and other Alpha 66 members were arrested while on board a boat with weapons in the Florida Keys. Id. at 10391-92, 10397-401, 10415-16. The weapons included pistols with magazines and ammunition, 50 caliber machine guns with ammunition, rifles with clips, and an RK. Id. at 10397-400. Pineiro was tried and found not guilty of possession of a Norinko AK 47 rifle and two pipe bombs. Id. at 10424. Pineiro and other Alpha 66 members were also stopped and released while on board a boat on 10 June 1994, but their weapons and boat were seized. Id. at 10409, 10411-14. The seized weapons included a machine gun and AK 47s. Id. at 10411-14.

United States Customs Agent Ray Crump testified that, on 20 May 1993, he participated in the arrest of several men whose boat was moored at a marina in Marathon, Florida. Id. at 10429. The boat held: several handguns; automatic rifles, including one fully automatic rifle;

Comandos F4,[53] Commandos L, CANF,[54] the Cuban American Military Council

four grenades; two pipe bombs; a 40 millimeter grenade launcher; a 50 caliber Baretta semiautomatic rifle; and a bottle printed with "Alpha 66" which contained "Hispanic propaganda . . . , . . . crayons, razors, stuff of that nature." Id. at 10431-33, 10434. He also participated in an investigation of a vessel south of Little Torch Key, about ten miles south of Marathon, Florida, on 11 July 1993. Id. at 10433-34. The vessel was carrying four men, numerous weapons, and "Alpha 66 type propaganda." Id. at 10434. The weapons on the vessel included an AR 15, two 7.6 millimeter rifles and ammunition magazines. Id. at 10438. Following this investigation, the men were not arrested, and the weapons and vessel were not seized. Id. at 10438-39.

United States Customs Agent Rocco Marco said that he encountered four anti-Castro militants on 27 October 1997, after their vessel, the "Esperanza", was stopped in waters off Puerto Rico. R90-10449. He explained that U.S. Coast Guard officers searched the vessel and found weapons and ammunition "hidden in a false compartment underneath the stairwell leading to the lower deck." The officers found food, water bottles, camouflage military apparel, night vision goggles, communications equipment, binoculars, two Biretta 50 caliber semiautomatic rifle with 70 rounds of ammunition, ten rounds of 357 hand gun ammunition, and magazines and clips for the firearms. R90 at 10453-59. The leader of the group, Angel Manuel Alfonso of Alpha 66, confessed to Rocco that they were on their way to assassinate Castro at ILA Marguarita, where he was scheduled to give a speech. Id. at 10452, 10467. Alfonso explained to Rocco that "his purpose in life was to kill [Castro]" and that it did not "matter if he went to jail or not. He would come back and accomplish the mission." Id. at 10468.

Debbie McMullen, the chief investigator with the Federal Public Defender's Office, testified that Ruben Dario Lopez-Castro was an individual associated with a number of anti-Castro organizations, including PUND and Alpha 66. R97 at 11267. Lopez and Orlando Bosch planned to ship weapons into Cuba for an assassination attempt on Castro. Id. at 11254. Bosch had a long history of terrorist acts against Cuba, and prosecutions and convictions for terrorist-related activities in the United States and in other countries. Campa Exh. R77 at 18-35.

[53] Rodolfo Frometa testified that, although he was born in Cuba, he was a citizen of the United States. R91 at 10531. He explained that he was a United States representative of a Cuban organization called Comandos F4, which was organized "to bring about political change in a peaceful way in Cuba" and included members both inside of and exiled from Cuban. Id. at 10532. He identified himself as the Commandate Jefe, or commander-in-chief, of F4 in the United States. Id. at 10534. He stated that, since 1994, all F4 members must sign a pledge that they will "respect the United States laws" and not violate either Florida or federal law. Id. at 10535.

Frometa stated that, before Comandos F4, he was involved with Alpha 66, another organization supporting political change in Cuba, from 1968 to 1994 and served as their commander "because of his firm and staunch position . . . against Castro." R91 at 10541-42. As

90

a member of Alpha 66, Frometa was stopped by police officers and questioned regarding his possession of weapons. He was first stopped on 19 October 1993, while in a boat which had been towed to Marathon, Florida, and was questioned regarding the onboard weapons. Id. at 10564-66. The weapons included seven semi-automatic Chinese AK assault rifles and one Ruger semi-automatic mini 14 rifle caliber 223 with a scope. Id. at 10564-66. On 23 October 1993, he was again stopped while he and others were driving a truck which was pulling a boat toward the Florida Keys. Id. at 10542-44. Frometa explained that they were carrying weapons to conduct a military training exercise in order to prepare for political changes in Cuba or in the case of a Cuban attack on the United States, and once the officers determined that their activities were legal, they were sent on their way. Id. at 10544-48, 10563. The weapons were semi-automatic and included an R15, an AK 47, and a 50 caliber machine gun. Id. at 10545-47. Frometa and several other Alpha 66 members were once more stopped and released on 7 February 1994 for having weapons on board his boat. Because a photograph of the group was "published in the newspapers" "[e]verybody in Miami" knew that they were released. Id. at 10569. On 2 June 1994, Frometa, by then a member of F4, was arrested after attempting to purchase C4 explosives and a "Stinger antiaircraft missile" in order to kill Castro and his close associates in Cuba. Id. at 10571-72, 10574-76, 10579-80. Frometa acknowledged that the use of the C4 explosive could have injured Cubans who worked at a military installation, id. at 10579, but that they had caused the "death of four U.S. citizens, the 41 people including 20 or 21 children who died; the mother of the child Elian, plus thousands and thousands who have died in the Straits of Florida." Id. at 91-10581.

[54] Percy Francisco Alvarado Godoy and Juan Francisco Fernandez Gomez testified by deposition. R95 at 11012; R99 at 11558-59. Godoy, a Guatemalan citizen residing in Cuba, described attempts between 1993 and 1997 by affiliates of the CANF to recruit him to engage in violent activities against several Cuban targets. 2SR-708, Att. 2 at 10-13, 21-24, 27-28, 33-34, 44-46, 61, 63-64. He said that, beginning in September 1994, he was asked to place a bomb at the Caberet Tropicana, a popular Havana nightclub and tourist attraction. Id. at 44-46. In connection with the same plot, he flew to Guatemala in November 1994 to obtain the explosives and detonators to be used and met with, among others, Luis Posada Carriles, a Cuban exile with a long history of violent acts against Cuba. Id. at 49, 52, 56-58. Unknown to the CANF members, Godoy was cooperating with the Cuban authorities, denounced their plans, and later testified at the trial of one of the conspirators in Cuba. Id. at 22, 24, 26, 31, 58-59, 65, 70, 76, 81-82, 86, 90, 109.

Gomez, a citizen and resident of Cuba, described numerous attempts between 1993 and 1997 by persons associated with the CANF to recruit him to engage in violent activities against several Cuban targets. Gomez also testified that, beginning in September 1994, he was asked to place a bomb at the Caberet Tropicana, a popular Havana nightclub and tourist attraction. In 1996 and 1998, Gomez was approached by Borges Paz of the anti-Castro organization the Ex Club, 2SR-708, Att. 1 at 9, 12-14, 20, 39; Gomez said that Paz invited him to join their organization to build and place bombs at tourist hotels and at the Che Guevara Memorial in

("CAMCO"), the Ex Club, Partido de Unidad Nacional Democratica ("PUND") or the National Democratic Unity Party ("NDUP"), and United Command for Liberation ("CLU").[55]  Alpha-66 ran a paramilitary camp training participants for an invasion of Cuba, had been involved in terrorist attacks on Cuban hotels in 1992, 1994, and 1995, had attempted to smuggle hand grenades into Cuba in March 1993, and had issued threats against Cuban tourists and installations in November 1993.  Alpha-66 members were intercepted on their way to assassinate Castro in 1997.  Brigade 2506 ran a youth paramilitary camp.[56]  BTTR flew into Cuban air space from 1994 to 1996 to drop messages and leaflets promoting the overthrow of Castro's government.  CID was suspected of involvement with an assassination attempt against Castro.  Comandos F4 was involved in an assassination attempt against Castro.  Commandos L claimed responsibility for a terrorist attack in 1992 at a hotel in Havana.  CANF planned to bomb a nightclub

---

Santa Clara, Cuba.  Id. at 16, 19, 22.  After returning to Cuba, Gomez informed the Cuban authorities of the Ex Club's plans.  Id. at 20, 35-36.  As a result of his work for the United States government, Gomez said that he was estranged from his family in the United States, including a daughter in Florida, and had received threatening phone calls.  Id. at 64-66.

[55]  R83 at 9162, 9165-67; R90 at 10373-74, 10391-92, 10397-10401, 10409, 10411-14, 10415-16, 10429, 10431-34, 10449, 10452-59, 10467-68; R91 at 10541-42, 10544-48, 10563-66, 10571-72, 10574-76, 10579-80; R97 at 11267, 11291-97; 2SR-708, Att. 1 at 9, 12-14, 16, 19-20, 22, 35-36, 39; Att. 2 at 10-13, 21-24, 27-28, 33-34, 44-46, 61, 63-64; Campa Exs. R-29D, R-29F, R-29G, R-29H.

[56]  R97 at 11296-97.

in Cuba.  The Ex Club planned to bomb tourist hotels and a memorial.  PUND planned to ship weapons for an assassination attempt on Castro.  Following each attack, Cuba had advised the United States of its investigations and had asked the United States' authorities to take action against the groups operating from inside the United States.[57]

The BTTR's flights over Cuba were of particular concern to the Cuban government, and the Cuban government had communicated that concern and its plan to use force to interrupt the flights to the Federal Aviation Administration ("FAA"), which shared that information with BTTR.[58]  BTTR's flights, however, continued until the shootdown in February 1996.[59]  The downing of the two BTTR planes was observed both by occupants of a fishing boat and by the crew and passengers onboard a cruise ship.[60]  The bodies of the people in the aircraft, three of whom were United States citizens, were never recovered.  Both planes

---

[57]  Campa Exs. R-29C; R-29F; R-29H; GH Exs. 16C, 24.

[58]  R76 at 8198-99, 8203-05; R83 at 9166-67; GH Exs. 18E, 18F.

[59]  R58 at 5919, 5922-23; R83 at 9161-65, 9167-70, 9181-83; GH Exs. 18E, 37 at 2-4, 6-8; Govt. Exs. 475A at 2-3, 478, 479, 483 at 8-11, 14-16; HF 108 at G-3, 113 at G-3.

[60]  R53 at 5109-14, 5117-18; Govt. Ex. 483 at 5-7, 11, 13, 17-18, 20. The cruise ship was Royal Caribbean's "Majesty of the Seas" with about 2,600 passengers and 800 crew.  R53 at 5084-86.  The first officer on the ship explained that they were on the last leg of a weekly cruise about 24 nautical miles off the north coast of Cuba during the shootdowns.  Id. at 5087-89, 5109-14.  A videotape of the shootdowns made by a cruise ship passenger was apparently "played on TV many times."  Id. at 5124.

were in international airspace, flying away from Cuba, when they were shot down; they had not entered Cuban airspace.[61]

Lieutenant Colonel Roberto Hernandez Caballero, of the Ministry of Cuba Department of State Security, testified that he investigated a number of terrorist acts in Havana and in other locations at Cuban-owned facilities during 1997.[62] He advised Medina of the attacks in April and directed that he search for any connection between the attacks and CAMCO.[63] In September, Hernandez notified the Cuban authorities that he had received information that one of the perpetrators of one of the bombings was available to meet for lunch and that he understood that

[61] R53 at 5113-21, 5131-33; Govt Exs. 440, 469B, 484.

[62] R93 at 10750-51, 10754-55, 10783-832. The acts included an explosion on 12 April 1997 which destroyed the bathroom and dance floor at the discotheque Ache in the Media Cohiba Hotel, id. at 10755, 10757, 10759; a bombing on 25 April 1997 at the Cubanacan offices in Mexico, R97 at 11318-19; the 30 April 1997 explosive device found on the 15th floor of the Cohiba Hotel, R93 at 10766-69, 10771; the 12 July 1997 explosions at the Hotel Nacional and Hotel Capri, both of which created "craters" in the hotel lobbies and did significant damage inside the hotels, id. at 10786-88, 10795-801; the 4 August 1997 explosion at the Cohiba Hotel which created a crater in the lobby and destroyed furniture; id. at 10802-05; explosions on 4 September 1997 at the Triton Hotel, the Copacabana Hotel, the Chateau Miramar Hotel, and the Bodequita del Medio Restaurant, id. at 10807-09, 10820; and, the discovery of explosive devices at the San Jose Marti International Airport in a tourist van in the taxi dispatch area on 19 October 1997 and underneath a kiosk on 30 October 1997, id. at 10824-30. The explosions on 4 September killed an Italian tourist at the Copacabana Hotel, injured people at the Chateau Miramar Hotel, the Copacabana Hotel, and at the Bodequita del Medio Restaurant, and caused property damage at all locations. Id. at 10809-13, 10815-20, 10822-23.

[63] R97 at 11316-18; Campa Exs. R57(a), R57(b) at 2, 59.

another large building in Cuba was targeted for the next week.[64]  Hernandez's

contact was instructed to elaborate on the information that he had obtained.[65]  As a

result of the investigations, Caballero said that the Cuban Department of State

Security arrested some individuals, but that they believed some of the individuals

responsible for financing, planning, and organizing the explosions lived in the

United States and had not been arrested.[66]  He explained that he provided FBI

agents with documentation and investigation materials regarding the terrorist acts

between 1990 and 1998, and received the FBI's findings in March 1999.

During the trial, the government described the Cuban intelligence operations as

"an intelligence pyramid" headed by Fidel Castro.[67]  It suggested that the Cuban

government applied the death penalty for throwing things out of airplane

windows,[68] and was "repressive"[69] and a "dictatorship."[70]

---

[64]  R97 at 11320-21.

[65]  Id. at 11321; Campa Ex. R63 at 1.

[66]  R93 at 10832, 10839, 10842.

[67]  R44 at 3699-700.  The U.S. Attorney asked government witness Stuart Hoyt to describe the structure of the Cuban intelligence system by questioning "who is at the top of the Cuban intelligence system."  R44 at 3699.  Hoyt responded by stating that "Fidel Castro" was at the top as "Commander-in-Chief", "[P]resident", "Council Minister", and "head of the Cuban Communist Party."  Id.

[68]  R73 at 7806-07.

[69]  R80 at 8748.  After a defense witness explained on cross-examination that the tone of the dissenters within Cuba was "more respectful" than that of Cuban exile organizations located

D.  Renewed Motions for Change of Venue

During the trial, the motions for change of venue were renewed through motions for a mistrial based on community events and trial publicity and a government witness's insinuation that a defense attorney was a spy or a communist.[71]  In February 2001, Campa moved for a mistrial and renewed his motion for a change of venue based on the commemorative flights honoring the fifth anniversary of the shootdown and the related television interviews and newspaper articles during the weekend of 24 February 2001.[72]  He argued that the newspapers included "an editorial by the Miami Herald that flatly condemns the Cuban government for this terrorist act" and articles including quotations from

---

outside of Cuba, the government attorney asked whether such an answer was relevant when it was a "[p]articularly repressive government."  R80 at 8748.  Late, after the witness stated that, if he had been a dictator, he would have tried to stop the BTTR flight, the government attorney questioned whether "[w]e live in a dictatorship."  Id. at 8754.  After the witness replied "Fortunately we don't,"
the government attorney commented, "And people do have that freedom of choice."  Id.

[70]  Id. at 8754.

[71]  R70 at 7130-36; R81 at 8947-49.  Although the district court did not overtly deny these motions, the motion based on community events and publicity was apparently resolved by "no response" to an inquiry to the jury as to whether they had "seen, heard, read, or [spoken to anyone] about any media accounts related" to the case following the trial's last recess.  R70 at 7136.  The motion based on the witness's insinuation was resolved by an instruction to the jury that the defense attorney's "job [wa]s to provide a vigorous defense for his client."  R81 at 8955.  "[The witness]'s statement regarding [the defense attorney] was inappropriate and unfounded."  Id. at 8949.

[72]  R70 at 7130.

96

CANF members discussing "at length" the facts of the trial.[73]  He maintained that a jury instruction would not cure the taint of these events and publicity.[74]  The court reserved ruling pending supplementation of the record and then, upon the defendants' request, questioned the jury as to their exposure to the news articles.[75]  When none of the jurors responded in any way, the case proceeded.[76]

Two weeks later, Campa, Gonzalez, Hernandez, and Medina filed a joint motion for a mistrial and change of venue arguing that the 24 February weekend events were so prejudicial that it could not be cured by voir dire or instructions[77]

Defense witness Basulto responded to questioning by asking Hernandez's defense counsel whether he was "doing the work" of the Cuban intelligence community.[78]  At the request of Hernandez's attorney, the trial judge struck the comment and the jury was instructed to disregard the comment.[79]  Following a recess, Campa's counsel argued that Basulto's insinuation was

---

[73] Id. at 7130-31.

[74] Id. at 7131.

[75] Id. at 7134-36.

[76] Id. at 7136.

[77] Id. at 5.

[78] R81 at 8945.

[79] Id.

precisely the kind[] of problem[] that we were afraid of when we filed our motions for a change of venue, and . . . in the aftermath of the events of February 24, 2001, we renewed our motion for . . . a change of venue based on the pretrial publicity, the publicity that has been generated during the course of the trial and our concern with our ability to obtain a fair trial in this community given that background.

This red baiting is absolutely intolerable, to accuse [Hernandez's attorney] because he is doing his job, of being a communist. It is unfortunate, it is the type of red baiting we have seen in this community before and we are concerned how it affects the jury. Here we are asking the jury to make a decision based on the evidence and only based on testimony and we are left and they are left with wondering what will they be accused. *These jurors have to be concerned unless they convict these men of every count lodged against them, people like Mr. Basulto who hold positions of authority in this community, who have access to the media, are going to call them of being Castro sympathizers, accuse them of being Castro sympathizers, accuse them of being spies and this is not the kind of burden this jury can shoulder when it is asked to try and decide those issues based on the evidence at trial.*

When someone can on the stand gratuitously and maliciously accuse [Hernandez's attorney] of being a spy[, it] sends a message to these ladies and gentlemen if they don't do what is correct, they will be accused of being communists too. These people have to go back to their homes, their jobs, their community and you can't function in this town if you have been labeled a communist, specially by someone of Mr. Basulto's stature.[80]

He asked that the court consider this event and the other events in its consideration

---

[80] Id. at 8947-49 (emphasis added). Basulto, the founder, president, and director of BTTR, was a Cuban-American who had worked with the Central Intelligence Agency to infiltrate the Cuban government. He was a prominent person in Miami, and made frequent appearances in Spanish-language media. During the trial, he testified that his work for the CIA was "dedicated to promot[ing] democracy in Cuba." R80 at 8822, 8825.

of the pending motion for change of venue.[81]

In May 2001, the district court denied the pending motions for change of venue on the basis of its earlier orders denying a change of venue and upon its finding that the 24 February events and the publicity surrounding it did not necessitate a change of venue because of its instructions to the jury.[82]

During closing arguments, the government made a number of comments to which the defendants objected. It stated that "the Cuban government" had a "huge" stake in the outcome of the case and that the jurors would be abandoning their community unless they convicted the "Cuban sp[ies] sent to . . . destroy the United States."[83] It maintained that the Cuban government sponsored "book bombs," "telephone threats of car bombs," and "sabotage," and "killed four innocent people."[84] It suggested that the Cuban government used "goon squads"

---

[81] Id. at 8949. In the alternative, counsel for Campa and Hernandez requested a jury instruction addressing Basulto's attack on Hernandez's counsel's credibility. R81 at 8949-53. The court found that the statements could affect "how the jurors view" Hernandez's counsel and instructed the jury that Hernandez's attorney's "job is to provide a vigorous defense for his client. Mr. Basulto's statement regarding [Hernandez's counsel] was inappropriate and unfounded." Id. at 8955.

[82] R120 at 13894-95.

[83] Id. at 14532, 14481.

[84] Id. at 14480.

to torture its critics.[85]  It asserted that the Cuban government had their agents falsify their identities by using the identification of "dead babies" and "stealing the memories of families."[86]  It contended that the defense argument that the agents were in the United States to keep an eye on the Cuban exile groups was false because they were on United States military bases, spying on United States military, the FBI, and Congress.[87]  The government implied that the government of Cuba was not cooperating with the FBI.[88]  It commented that Cuba "was not alone" in shooting down civilian aircraft as they "are friends with our enemies," including "the Chinese and the Russians," and compared the BTTR shootdown to the 1986 Libyan shootdown of a civilian aircraft.[89]  It maintained that the government of Cuba did not care about the occupants of the planes, and that it shot down the planes even though they could have forced Basulto's plane to land.[90]  It argued that Cuba was a "repressive regime [that] doesn't believe in any [human]

---

[85]  Id. at 14495.

[86]  Id. at 14480-81.

[87]  Id. at 14483-85, 14488.

[88]  Id. at 14493.

[89]  Id. at 14512-13.

[90]  Id. at 14513.

rights."[91]  It summarized that the defendants had joined an "intelligence bureau . . .

that sees the United States of America as its prime and main enemy" and that the

jury was "not operating under the rule of Cuba, thank God."[92]  The defendants'

objections were sustained, and the jury was instructed to consider only the

evidence admitted during the trial and to remember that the lawyers' comments

were not evidence.[93]

F.  Jury Conduct and Concerns During the Trial

Five months into the trial, when one seated juror had a two-day conflict, the

court discussed the possibility of removing that juror and seating one of the

alternates.[94]  Hernandez's attorney requested a recess, arguing that the parties and

the court had worked very hard to select "a jury we are very happy with" and

maintained that it would be unreasonable to refuse to accommodate the juror after

her length of service and her request to complete the trial.[95]  The district court

granted the recess.[96]

---

[91]  Id. at 14519.

[92]  Id. at 14475.

[93]  Id. at 14482, 14483, 14493;  R125 at 14583.

[94]  R104 at 12091-92.

[95]  Id. at 12091-94.

[96]  Id. at 12094-95.

In early February 2001, a small protest related to the trial was held outside of the courthouse, but the jury was protected from contact with the protestors and from exposure to the demonstration.[97] On 13 March 2001, the court noted that the day before, cameras were focused on the jurors as they left the building.[98] Despite the court's arrangements to prevent exposure to the media, jurors were again filmed entering and leaving the courthouse during the deliberations and that footage was televised.[99] Some of the jurors indicated that they felt pressured; therefore, the district court again modified the jurors' entry and their exit from the courthouse and transportation.[100] However, the Metrorail Center, where the jurors using public transportation were taken, is the site of a prominently displayed monument to the shootdown victims.

As the en banc opinion states, the jurors were again filmed entering and leaving the courthouse "all the way to their cars" during the deliberations.[101] The district judge arranged for their entrance into the courthouse by private entrance

---

[97] R59 at 6096-108, 6145-49. The 20 protestors carried signs stating "take Castro down," "[f]air trial wanted," and "spies to be killed." Id. at 6145.

[98] R81 at 9005.

[99] R126 at 14644-47.

[100] Id. at 14645-47.

[101] R126 at 14643-46.

and guarded transportation to their vehicles or to mass transit. The electronic eyes of the community were focused upon them and the jury could not help but understand that focus.

## G. Post-Trial Motions for New Trial

Following the trial, in late July and early August 2001, Campa, Gonzalez, Guerrero, and Medina moved for a new trial and renewed their motions for a change of venue, arguing that their fears of presumed prejudice remained.[102] The district court denied the motions, concluding that "any potential for prejudice was cured" "through the Court's methodical, active pursuit of a fair trial from voir dire . . . to . . . the return of verdict."[103]

In November 2002, Guerrero renewed his motion for a new trial based on newly discovered evidence and in the interests of justice; the motion was adopted by Campa, Gonzalez, Hernandez, and Medina.[104] Guerrero argued that a new trial was warranted because of "misrepresentations of fact and law made by the United States Attorney in opposing the . . . motion for change of venue" and that the

---

[102] R12-1338 at 2-3; R12-1342 at 2-3; R12-1343 at 1-4; R12-1347 at 1-2.

[103] Id. at 15.

[104] R15-1635, 1638, 1644, 1647, 1650, 1651. The National Jury Project, the National Lawyers Guild, the International Association of Democratic Lawyers sought and were granted leave to file briefs as amicus curiae in support of this motion. R15-1640, 1653, 1654, 1655, 1677.

government's position regarding change of venue was contradicted by its position in a motion for change of venue which the government filed in Ramirez v. Ashcroft, No. 01-4835-Civ-Huck (S.D. Fla.) on 25 June 2002. In the Ramirez motion, the government argued that:

> the Elian Gonzalez matter was an incident which highly aroused the passions of the community and resulted in numerous demonstrations . . . .
>
> 5. While the Elian Gonzalez affair has received national attention[,] the exposure in Miami-Dade County has been continuous and pervasive. Indeed, even now, more than a year after the return of Elian to his father [in April 2000], there continues to be extensive publicity . . . which will arouse and inflame the passions of the Miami-Dade community. . . .
>
> 8. Historically, media articles relating to Elian Gonzalez and the handling of his return to his father have persisted from November 1999 to the present [June 2002].[105]

The government, borrowing arguments advanced by the defendants in this case, declared that

> [i]t cannot be disputed that the return of Elian Gonzalez to his father in Cuba created a serious rift in this community, a rift which continues to the present. This rift exists not only between Hispanics and non-Hispanics, but also between Cubans a[n]d non-Cubans and within the Cuban community itself. It is beyond dispute that virtually every person in Miami-Dade county [sic] has a strong opinion, one way or another, regarding the INS and the U.S. Attorney General's Office, and the

---

[105] R15-1636, Ex. 2 at 2-3, 11.

manner in which the Elian Gonzalez matter was handled. The effect of the media coverage . . . serves to foment and revive these feelings on an ongoing basis. . . . As such the media accounts cannot do anything other than create the general state of mind where the inhabitants of Miami-Dade County are so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the instant case solely on the evidence presented in the courtroom. . . . Under such circumstances and strongly held emotions, and in light of the media coverage . . . , it will be virtually impossible to ensure that the defendants will receive a fair trial if the trial is held in Miami-Dade County.[106]

The government requested "a change in the location/venue" "outside of Miami Dade County to ensure that the Defendant . . . receive a fair and impartial trial on the merits of the case."[107] They noted that, "[w]hile not requested," the court also had the discretion to transfer the trial to another judicial district.[108] The government orally argued that there were no incidents "since 1985 that so polarized the community. That so affected every individual in the community as the Elian Gonzalez affair."[109] When the district court asked whether a transfer of

---

[106] Id. at 14-15.

[107] Id. at 17, 16.

[108] Id. at 16 n.1.

[109] R15-1636, Ex. 3 at 24. I note that the Elian Gonzalez matters occurred between the 1998 indictment of the defendants in this case and the beginning of their trial in 2000. The first anniversary protests of Elian Gonzalez's return to Cuba occurred during these defendants' trial.

the case to the Fort Lauderdale division courthouse would be sufficient, the government responded that "[t]he demonstrations occurred in Miami. They are predominantly conducted by citizens of Miami Dade county [sic]. As you move the case out of Miami Dade you have less likelihood there are going to be deep-seated feelings and deep-seated prejudices in the case."[110]

In support of the interests of justice argument, the defendants included an affidavit by Professor Moran, news articles, reports by Human Rights Watch regarding threats to the freedom of expression within the Miami Cuban exile community, a public opinion survey conducted by legal psychologist Dr. Kendra Brennan, and a study by Florida International University's Professor of Sociology and Director of the Cuban Research Institute Dr. Lisandro Pérez.[111]

The district court denied the motion, improperly finding that the government's position in <u>Ramirez</u> was not newly discovered evidence and that it lacked jurisdiction to consider the interests of justice argument. It did not, therefore, consider any of the exhibits attached to the motion.[112]

## II.  DISCUSSION

---

[110] <u>Id.</u> at 25.

[111] R15-1636, Exs. 4, 5, 7-10, 12.

[112] R15-1678 at 5, 6 n.3, 8.

A.  Denial of Motion for Change of Venue

This case presents the opportunity to clarify circuit law to conform with Supreme Court precedent.  The district court misfocused its inquiry under Federal Rule of Criminal Procedure 21(a).

Our review of the denial of a motion for change of venue is multi-level.  We review the district court's interpretation of the Federal Rules of Criminal Procedure de novo[113] and its application of Rule 21(a) for an abuse of discretion.[114] Under an abuse of discretion standard, we will not disturb a decision which was made within the "range of possible conclusions" available to the district court, was not an error of judgment, or was not the misapplication of law.[115]  A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors.[116]  "When a criminal defendant alleges that pretrial publicity

---

[113]  See United States v. Noel, 231 F.3d 833, 836 (11th Cir. 2000) (per curiam).

[114]  See United States v. Williams, 523 F.2d 1203, 1208 (5th Cir. 1975).  In Bonner v. City of Pritchard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to 1 October 1981.

[115]  United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc) (internal citation omitted).

[116]  Ameritas Variable Life Ins. Co. v. Roach, 411 F.3d 1328, 1330 (11th Cir. 2005) (per curiam).

107

precluded a trial consistent with the standards of due process, it is the duty of a reviewing court to undertake an independent evaluation of the facts established in support of such an allegation."[117]

A district court's consideration of a federal criminal defendant's motion for change of venue is guided by Rule 21(a), which directs that the court must transfer the proceedings "if the court is satisfied that so great a prejudice against the defendant exists . . . that the defendant cannot obtain a fair and impartial trial."[118] To show *presumed*, rather than *actual* prejudice, the defendant must show that "outside influences affecting the community's climate of opinion as to a defendant are inherently suspect" and that "the resulting probability of unfairness requires suitable procedural safeguards, such as a change of venue."[119]  In reviewing whether the outside influences operated to deprive the defendants of a fair trial, we may "widen our breadth of consideration" and may consider the combined effect of various factors.[120]  Courts, therefore, look at not only the pretrial publicity, but

---

[117]  Williams, 523 F.2d at 1208; Sheppard v. Maxwell, 384 U.S. 333, 362, 86 S. Ct. 1507, 1522 (1966) ("Appellate tribunals have the duty to make an independent evaluation of the circumstances.").

[118]  Fed. R. Crim. P. 21(a).

[119]  Pamplin v. Mason, 364 F.2d 1, 5 (5th Cir. 1966); See also Sheppard, 384 U.S. at 362, 86 S. Ct. at 1522  ("Due process requires that the accused receive a trial by an impartial jury free from outside influences.")

[120]  Williams, 523 F.2d at 1209.

will also consider "inherent community prejudice,"[121] the government's closing argument,[122] an "inflamed community atmosphere,"[123] the connection between the community prejudice and the trials,[124] the interplay between the crime and the economic life of the community,[125] and a familiarity with unpopular or ill-reputed groups with whom the defendant was associated.[126]  In cases alleging pervasive community prejudice, publicity or intense media coverage evidence is not the focus; it is one form of evidence proffered to show the prejudice within the community.[127]  "[P]ervasive [community] prejudice may not be presumed simply

---

[121]  Jordan v. Lippman, 763 F.2d 1265, 1266, 1267, 1269, 1279 (11th Cir. 1985) (finding that, in a state habeas corpus proceeding, a new trial based on a change of venue was required when "extensive publicity" was coupled with the community's "long history of racial turbulence" and the involved institution's "economic and social impact" on community).

[122]  Williams, 523 F.2d at 1209.

[123]  Coleman v. Kemp, 778 F.2d 1487, 1489 (11th 1985).

[124]  Meeks v. Moore, 216 F.3d 951, 967 (11th Cir. 2000).

[125]  United States v. Farries, 459 F.2d 1057, 1061 (3rd Cir. 1972).

[126]  United States v. Angiulo, 897 F.2d 1169, 1181-82 (1st Cir. 1990).  Other courts have considered how the charged crime reinforced "deeply-rooted passions" and "deeply-held prejudice" within the community, United States v. Holder, 399 F. Supp. 220, 227-28 (D.S.D. 1975), how the charged crimes related to the community reputation, United States v. Wheaton, 463 F. Supp. 1073, 1078 (S.D.N.Y. 1979), the defendants' state citizenship and community racial bias, United States v. Washington, 813 F. Supp. 269, 274, 275 (D. Vt. 1993), "extreme community hostility," the defendant's prominence in the community, the victim's position as a public servant, and the defendant's position as a community "outsider."  New Jersey v. Koedatich, 548 A.2d 939, 963 (N.J. 1988).

[127]  United States v. Capo, 595 F.2d 1086, 1090 (5th Cir. 1979).

from the context of [news] articles alone" but must be supported by evidence of the influence of that publicity.[128]

We review the "special facts" of each case alleging prejudicial publicity[129] and the totality of the circumstances of cases alleging presumed prejudice.[130] The totality of the circumstances includes all of the circumstances and events occurring before and during the trial and their cumulative effect,[131] including an extensive voir dire.[132] Where the community sentiment is strong, courts should place "emphasis on the feeling in the community rather than the transcript of voir dire," which may not "reveal the shades of prejudice that may influence a verdict."[133] A court does not undertake a totality of the circumstances' review by confining itself to community publicity which relates only to the guilt or innocence of the defendant. It may, therefore, consider the effect of the publicity and the timing of

---

[128] Mayola v. Alabama, 623 F.3d 992, 999 (5th Cir. 1980).

[129] Marshall v. United States, 360 U.S. 310, 312, 79 S. Ct. 1171, 1173 (1959) (per curiam).

[130] See Murphy v. Florida, 421 U.S. 794, 798-99, 95 S. Ct. 2031, 2035-36 (1975).

[131] See Williams, 523 F.2d at 1206 n.7.

[132] See Patton v. Yount, 467 U.S. 1025, 1029, 1034, 104 S. Ct. 2885, 2888, 2890 (1984).

[133] Pamplin, 364 F.2d at 7.

the trial during a hotly contested election involving the prosecutor and judge,[134] publicity during a Presidential election in which a similar crime was a subject of debate,[135] the extent of the dissemination of the publicity,[136] the character of that publicity,[137] the proximity in time of the publicity to the trial,[138] the familiarity of the jury with the charged crime,[139] and the setting and kind of community in which the coverage and trial took place.[140]  I recognize that publicity which is unrelated to the defendant or to the matters at trial may not have the evidentiary weight necessary to establish prejudicial pretrial publicity, but also note that publicity that does not "directly relate" to the defendant or the charge offense may be significant

---

[134]  Sheppard, 384 U.S. at 352, 354, 86 S. Ct. at 1517-18.

[135]  Mu'Min v. Virginia, 500 U.S. 415, 429, 111 S. Ct. 1899, 1907 (1991).

[136]  Williams, 523 F.2d at 1209.

[137]  Id. at 1209; Murphy, 421 U.S. at 802, 95 S. Ct. at 2037.

[138]  Murphy, 421 U.S. at 802, 95 S. Ct. at 2037; Williams, 523 F.2d at 1210.

[139]  Murphy, 421 U.S. at 800, 95 S. Ct. at 2036; Williams, 523 F.2d at 1210.   As the en banc opinion correctly notes, the defendants used only 15 of their 18 challenges to the jury pool to excuse jurors whose answers revealed their potential bias against them.  Although a defendant's failure to use all available preemptory challenges may indicate a lack of juror prejudice, United States v. Alvarez,755 F.2d 830, 859 (11th Cir. 1985), such a fact is merely one factor to be considered in the totality of the circumstances determination.  United States v. Gorel, 622 F.2d 100, 103-04 (5th Cir. 1979); Dobbert v. Florida, 432 U.S. 282, 302-03, 97 S. Ct. 2290, 2303 (1977).

[140]  See Sheppard, 384 U.S. at 354-55, 86 S. Ct. at 1518; Mu'Min, 500 U.S. at 429, 111 S. Ct. at 1907.

to the trial.[141]

In this case, however, the district court focused solely on the prejudicial publicity prong of the analysis.[142] *It made no findings regarding the prejudice within the community.* In denying a change of venue, the district court ignored its own recognition of the substantial likelihood of prejudice as a result of witnesses' press events and the unsequestered jury's exposure,[143] the community events and memorials honoring the victims of the shootdown, and the fear created in the minds of the jurors from the evidence of spies and weapons in their neighborhoods, and the history of violence practiced by some members of the Cuban-exile community.

Despite the district court's numerous efforts to ensure an impartial jury in

---

[141] Jordan, 763 F.2d at 1279 ("[E]ven to the extent that the publicity did not directly relate to the [defendant's] case, it would be naive to underestimate its significance in the context of the trial . . . . [W]e cannot blind ourselves to the significant [prejudicial] overtones in the news media coverage" of community events.).

[142] Hernandez, 106 F. Supp. 2d at 1319, 1321 n.2, 1322. Further, there is no indication that the district court considered the community and the events ongoing in the community within a totality of the circumstances analysis in either the rulings on the a change of venue or the motions for a new trial.

[143] R7-978 at 9 n. 5 ("Articles about this case have appeared daily in the Miami Herald and El Nuevo Herald[,] weekly in the national and international press [and that] local televised news programs, particularly those affiliated with the Spanish-speaking channels, have featured coverage of the trial since it began."); id. at 15, 17 (finding "significant" "local and national media coverage" since the indictment that had "only intensified as the trial has progressed . . . and that "[s]ince the trial began, this case has been the daily bread for the local press and media").

this case, I am not convinced that empaneling such a jury in this community was possible because of pervasive community prejudice. The entire community is sensitive to and permeated by concerns for the Cuban exile population in Miami. Waves of public passion, as evidenced by the public opinion polls and multitudinous newspaper articles submitted with the motions for change of venue–some of which focused on the defendants in this case and the government for whom they worked but others which focused on relationships between the United States and Cuba--flooded Miami both before and during this trial.[144] The trial required consideration of the BTTR shootdown and the martyrdom of those persons on the flights. During the trial, there were both "commemorative flights" and public ceremonies to mark the anniversary of the shootdown. Moreover, the Elian Gonzalez matter, which was ongoing at the time of the change of venue motion, concerned these relationships between the United States and Cuba and necessarily raised the community's awareness of the intense and emotional concerns of the Cuban exile community. It is uncontested that the publicity concerning Elian Gonzalez continued during the trial, "arous[ing] and inflam[ing]" passions within the Miami-Dade community.[145] Despite the district court's

---

[144] Without determining the validity of Professor Moran's poll, I note that the district court approved the expenditures related to the poll, including the size of the statistical sample.

[145] R15-1636, Exh. 2 at 2-3.

thorough and extensive voir dire and its many efforts aimed at protecting the jurors' privacy, voir dire highlighted the community's awareness of this case and also that of Elian Gonzalez.  The district court's gag order failed to restrain the widespread publicity of the shootdown anniversary memorials and demonstrations.  The jurors continued to be concerned about their exposure to the press into their deliberations.  With the emotional intensity of the events in the community and the publicity of those events, which relate both directly and indirectly to these defendants, the "jurors may well have been affected even if they were attempting to follow the court's instructions."[146]  In this instance, there was no reasonable means of assuring a fair trial by the use of a continuance or voir dire; thus, a change of venue was mandated.  The evidence at trial validated the media's publicity regarding the "Spies Among Us" by disclosing the clandestine activities of not only the defendants but also of the various Cuban exile groups and their paramilitary camps that continue to operate in the Miami area.  The perception that these groups could harm jurors that rendered a verdict unfavorable to their views was palpable.  Further, the government witness's reference to a defense counsel's allegiance with Castro and the government's arguments regarding the evils of Cuba and Cuba's threat to the sanctity of American life only served to add fuel to

---

[146] Jordan, 763 F.2d at 1279.

the inflamed community passions. "[I]t would be blinking reality not to recognize the extreme prejudice inherent" in this unique circumstance.[147]

B. Denial of New Trial

A district court is authorized to grant a new trial on the basis of newly discovered evidence if a motion for new trial is filed within three years of the verdict.[148] The newly discovered evidence must satisfy a five-part test: (1) the evidence was newly discovered after the trial; (2) the movant shows due diligence in discovering the evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to issues before the court; and (5) the evidence is of such a nature that a new trial would reasonably produce a new result.[149] Newly discovered evidence is not limited to just the question of the defendant's innocence but can include other issues of law,[150] including questions of the fairness of the trial.[151]

The government's motion in Ramirez meets these criteria. Although the facts in Ramirez differ from the facts in this case, there are remarkable similarities,

---

[147] Turner v. Louisiana, 379 U.S. 466, 473, 85 S. Ct. 546, 550 (1965).

[148] See Fed. R. Crim. P. 33(a) and (b)(1).

[149] See United States v. DiBernardo, 880 F.2d 1216, 1224 (11th Cir. 1989).

[150] See United States v. Beasley, 582 F.2d 337, 339 (5th Cir. 1978) (per curiam).

[151] See United States v. Williams, 613 F.2d 573, 575 (5th Cir. 1980).

including the plaintiff's [or, in this case, the government's witnesses] exploitation of the media's coverage of the evidence and the issues at trial. In Ramirez, a civil employment discrimination case, the government was defending the INS against a Hispanic plaintiff. More significant, however, is that the underlying facts for the government's motion in Ramirez regarding the pervasive community prejudice were based on publicity and events that occurred before and during the trial of this case, "November 1999 to the present [June 2002],"[152] and which were much closer in temporal proximity. The newly discovered evidence, therefore, was not the facts on which the government's Ramirez motion was based but was the government's position on the events which were occurring during the trial of these defendants and its legal position as to the applicability of Pamplin.[153]

Attorneys representing the United States are burdened both with an obligation to zealously represent the government and, as a "representative of a government dedicated to fairness and equal justice to all," an "overriding obligation of fairness" to defendants.[154] That obligation includes a "duty to refrain

---

[152] R15-1636, Exh. 2 at 1-2.

[153] In response to the defendants' motion for a change of venue in this case, the government had argued that Pamplin did not apply where the alleged prejudice was the "community's internal attitudes" as opposed to an outside influence. R3-443 at 6.

[154] United States v. Wilson, 149 F.3d 1298, 1303 (11th Cir. 1998).

116

from improper methods calculated to produce a wrongful conviction."[155] A trial may be rendered fundamentally unfair by the prosecution's use of factually contradictory theories.[156] A prosecutor's reliance on a legal position despite "knowing full well" that it is wrong is "reprehensible" in light of his duty "by virtue of his oath of office."[157] Further, when the government has sought to foreclose the submission of evidence, an evidentiary hearing is warranted on a motion for new trial when the newly discovered evidence "might likely lead" to a new trial.[158]

We do not know when the government changed its position regarding both

---

[155] United States v. Crutchfield, 26 F.3d 1098, 1103 (11th Cir. 1994) (internal citation omitted).

[156] See Smith v. Groose, 205 F.3d 1045, 1051-52 (8th Cir. 2000) (holding that the prosecution's use of contradictory theories for different defendants in a murder trial violated due process). Our adversary system is "poorly served when a prosecutor, the state's own instrument of justice, stacks the decks in his favor." Id. at 1051.

I recognize that that judicial equitable estoppel generally bars a party from asserting a position in a legal proceeding that is inconsistent with its position in a previous, related proceeding. See New Hampshire v. Maine, 532 U.S. 742, 749, 121 S. Ct. 1808, 1814 (2001). Judicial equitable estoppel, however, is not applicable here because Ramirez, a civil case, was unrelated to this criminal prosecution. However, because the doctrine seeks to prevent a "party from 'playing fast and loose'" with the courts, the guidance that it provides may be helpful to parties considering a change in their subsequent position in unrelated litigation based upon the same set of facts. See 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4477 (2d ed. 2002).

[157] United States v. Masters, 118 F.3d 1524, 1525 & n.4 (11th Cir. 1997) (per curiam).

[158] United States v. Espinosa-Hernandez, 918 F.2d 911, 914 (11th Cir. 1990) (per curiam).

the application of <u>Pamplin</u> and the pervasive community prejudice in Miami-Dade County because there was no evidentiary hearing. Because the government's timing on its change of position might lead to a new trial, an evidentiary hearing was warranted.

Here, a new trial was mandated by the perfect storm created when the surge of pervasive community sentiment, and extensive publicity both before and during the trial, merged with the prosecutor's improper prosecutorial references and position regarding a change of venue. Moreover, the evidence at trial strongly suggested not only adverse economic consequences for jurors voting for acquittal, but the prospect of violence from an already impassioned and emotional community possessed of firearms and bombs. The district court's instructions to the jury only generally reminded the jury that statements by the attorneys were not evidence to be considered. The community's displeasure with the Elian Gonzalez controversy paled in comparison with its revulsion toward the BTTR shootdown. In a civil case which arose out of the same facts as this criminal prosecution, the BTTR shootdown was described as an "outrageous contempt for international law and basic human rights" perpetrated by the Cuban government in murdering "four human beings" who were "Brothers to the Rescue pilots, flying two civilian, unarmed planes on a routine humanitarian mission, searching for rafters in the

waters between Cuba and the Florida Keys."[159]  In <u>Ramirez</u>, the government not only recognized the effect of the Elian Gonzalez matter on the community but also argued that the publicity continued through 2002.  If the effect of those inflamed passions is clear in an employment discrimination action against the agency that contributed to Elian Gonzalez's removal and that failed to support the Cuban exiles' position, it is manifest in a criminal case against admitted Cuban spies who were alleged to have contributed to the murder of "humanitarians" working to rescue rafters such as Elian Gonzalez.

### III.  CONCLUSION

In light of the foregoing discussion, I can only conclude that the defendants' convictions should be reversed and the case should be remanded for a new trial.

I am aware that, for many of the same reasons discussed above, the reversal of these convictions would be unpopular and even offensive to many citizens.  However, I am equally mindful that those same citizens cherish and support the freedoms they enjoy in this country that are unavailable to residents of Cuba.  One of our most sacred freedoms is the right to be tried fairly in a noncoercive atmosphere and thus be afforded a fair trial.  In the final analysis,  we are a nation of laws in which every defendant, no matter how unpopular, must be

---

[159]  <u>Alejandre</u>, 996 F. Supp. at 1242.

treated fairly–a concept many consider alien to the current Cuban regime. Our

Constitution requires no less.